## ALEX JOHNSON V. THE STATE.

### No. 2428. Decided April 1, 1914.

### Rehearing denied June 10, 1914.

**1.—Murder—Self-defense—Charge of Court—Character and Disposition of Deceased.**

Where, upon trial of murder, the defendant testified that deceased was a large, heavy man of an overbearing and ungovernable temper and defendant had been informed of numerous difficulties in which deceased had been engaged, etc., and the court submitted a proper charge on self-defense requiring the jury to consider the manner and character of the attack and the relative strength of the parties and defendant's knowledge of the character and disposition of the deceased, etc., there was no reversible error.

**2.—Same—Murder in Second Degree—Reasonable Doubt—Charge of Court —Burden of Proof.**

Where the court's charge on murder in the second degree was couched in proper language, and did not shift the burden of proof, but required the jury to find beyond a reasonable doubt before they could convict defendant that he did not act in self-defense, etc., there was no reversible error.

**3.—Same—Manslaughter—Charge of Court—Adequate Cause.**

Where, upon trial of murder and a conviction of murder in the second degree, the evidence showed that defendant was excited by the insulting words and gestures of the deceased, but there was no adequate cause under the statute to create this excitement, the issue of manslaughter was not raised; however, the court having, nevertheless, instructed on manslaughter, the defendant could not complain, even if the court's charge on manslaughter could be considered on appeal. Following Eggleston v. State, 59 Texas Crim. Rep., 543.

**4.—Same—Harmless Error.**

Even if there were error in the charge on manslaughter, that issue not being in the case, it would present no error.

**5.—Same—Insulting Words.**

Insulting words alone are not adequate cause to reduce an offense to manslaughter, and calling a man a son-of-a-bitch, or damned son-of-a-bitch, is not adequate cause to reduce an offense to manslaughter. Following Simmons v. State, 23 Texas Crim. App., 653, and other cases.

**6.—Same—Rule Stated—Adequate Cause.**

It has always been held that if there be no legal adequate cause to produce the state of mind such as anger, rage, sudden resentment or terror, even if such state of mind does exist, the offense is not manslaughter, but murder in the second degree. Following Kelly v. State, 68 Texas Crim. Rep., 317, and other cases.

**7.—Same—Bloody Clothing—Bill of Exceptions.**

Where the bill of exceptions to the introduction of the bloody clothing of the deceased simply stated that defendant excepted for the reason stated, and the qualification of the bill showed that the introduction of said clothes was

necessary to show the attitude and position of the deceased at the time he was killed, there was no error.

#### 8.—Same—Evidence—Leading Question.

Where the bill of exceptions showed that the court sustained an objection to a leading question as to the attitude of the deceased and informed counsel that there was no objection to asking what was said, etc., there was no error.

#### 9.—Same—Evidence—Declarations by Deceased.

Where, upon trial of murder, there was no controversy about the facts that the deceased before he was shot used profane language towards the defendant, there was no error in sustaining an objection to the conclusion of the witness whether the language of the deceased was vile and profane.

#### 10.—Same—Evidence—Character of Deceased—Specific Acts—Details.

Where, upon trial of murder, defendant claimed that he knew at the time of the killing that deceased was a dangerous, overbearing man, etc., and was permitted to introduce in evidence various specific acts to show that the deceased had difficulties with other parties at different times before the homicide and that defendant was informed thereof and that such matters did occur, it was not permissible to go into the details of, those transactions, and the court did not error in so holding.

#### 11.—Same—Evidence—Character of Deceased.

Where, upon trial of murder, the defendant not only testified that deceased had been indicted for murder in another county some twenty-five years prior to the instant case, and then showed by the clerk of said county and the records thereof that the deceased had in fact been indicted for murder, there was no error in permitting the State in rebuttal to show that the deceased had been acquitted of said charge and that in fact he had no connection with the alleged offense; besides, the bill of exceptions was defective.

#### 12.—Same—General Reputation of Deceased—Evidence.

Where, upon appeal from a conviction of murder, the record disclosed that decedent upon defendant's trial, was attacked as being a violent, high-tempered, dangerous and overbearing man and many specific instances bearing on these matters were introduced in evidence by the defendant and were assigned as one of the reasons why defendant shot deceased, there was no error in permitting the State in rebuttal to introduce evidence that the general reputation of the deceased was that of a peaceable, law-abiding citizen.

#### 13.—Same—Argument of Counsel—Bill of Exceptions.

Where, upon trial of murder, the State's attorney, in most of his argument, remained in the record and legitimately discussed the evidence and only in one instance alluded to matters that he could not have shown, but the court properly instructing the jury not to consider said improper remarks, there was no reversible error.

#### 14.—Same—Manslaughter—Charge of Court—False Imprisonment.

Where, upon trial of murder, the facts did not show that, at the time of the homicide, deceased was guilty of falsely imprisoning the defendant and that thereby the offense was reduced to manslaughter, there was no error in the court's failure to submit this issue. Distinguishing Herring v. State, 3 Texas Crim. App., 108, and other cases.

#### 15.—Same—Case Stated—Manslaughter—Charge of Court—Combination of Circumstances.

Where, upon trial of murder, the evidence did not show an assault and battery of any character by the deceased at the time of the homicide, and everything that occurred took place on the occasion of the homicide, and the deceased simply threatened violence if defendant again disputed his word and made a threatening gesture, when defendant shot and killed him; this presented self-defense purely, and not such a combination of circumstances which would present adequate cause and reduce the offense to manslaughter; however, the

court submitted a proper charge on manslaughter requiring the jury that if by combination of all the circumstances defendant was incapable of cool reflection, etc., to find him guilty of manslaughter, and the defendant could not complain. Following Jirou v. State, 53 Texas Crim. Rep., 18, and other cases.

### 16.—Same—Rule Stated—Adequate Cause—Combination of Circumstances.

While there may be a combination of circumstances and acts which will be adequate cause to reduce an offense to manslaughter, yet if the conduct and acts are of the character and kind that the statute says shall not be deemed adequate cause, then manslaughter is not raised, and mere abusive language, if accompanied by an assault, which the whole record shows caused no pain or bloodshed, and it is not contended that it did, it is not, and will not be sufficient to raise the issue of manslaughter. Distinguishing Wadlington v. State, 19 Texas Crim. App., 266.

### 17.—Same—Provocation—Charge of Court.

In every case, except in a case of insult to a female relative which is fixed at the first meeting thereafter, the provocation must arise at the time, the court correctly so instructing the jury in the instant case.

### 18.—Same—Cooling Time—Charge of Court—Statutory Adequate Cause.

In a case where statutory adequate cause is in the case, the court should so instruct the jury and if there be the issue of cooling time raised by the evidence, the court should instruct the jury thereon, but there being no statutory adequate cause and the court instructing the jury to consider all the facts, circumstances, etc., in his charge on manslaughter, a charge on cooling time would have been improper and injurious to defendant, and he can not complain. Following Hancock v. State, 47 Texas Crim. Rep., 3.

### 19.—Same—Self-defense—Threats—Charge of Court.

Where, upon trial of murder and a conviction of murder in the second degree, there were no definite threats in evidence, but if any, they were indirect, occurring in the presence of the defendant at the time of the homicide, there was no error in the court's failure to charge thereon.

### 20.—Same—Evidence—Character of Deceased—Specific Acts.

Where, upon trial of murder, proof of specific acts of violence were admissible, yet an indictment for murder against the deceased some twenty-five years before the homicide was too remote and did not prove in itself a specific act of violence or raise the presumption that the homicide was unlawful, however, the State had the right to rebut the inference sought to be drawn therefrom and to show that said indictment was in fact no proof of the bad character of deceased. Following Hysaw v. State, 69 Texas Crim. Rep., 562, and other cases.

### 21.—Same—Rule Stated—Specific Acts—Cross-examination.

Whenever the circumstances are such as to authorize the defendant to introduce specific acts of violence by the deceased, the State on cross-examination should then be permitted to go into the particulars of such specific acts for the purpose of showing that the deceased was justifiable, or rebut the defendant's theory that such act showed him to have been a violent and dangerous person. Following Bullock v. State, 165 S. W. Rep., 196 and other cases.

### 22.—Same—Case Stated—General Objections—Other Testimony.

While the details as to deceased's acquittal under an indictment for murder long prior to the homicide was not admissible, yet where the objection to said testimony was general and was not specifically directed to that part of the testimony which was inadmissible with reference to the details of said acquittal, there was no reversible error. Following Ortiz v. State, 68 Texas Crim. Rep., 524, and other cases. Davidson, Judge, dissenting.

Appeal from the District Court of McLennan. Tried below before the Hon. Richard I. Munroe.

Appeal from a conviction of murder in the second degree; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Gallagher & Stratton* and *Williams & Williams,* for appellant.—On question of introducing countervailing proof on specific acts of violence: Wright v. State, 63 Texas Crim. Rep., 429, 140 S. W. Rep., 1105; Campbell v. State, 62 Texas Crim. Rep., 561, 138 S. W. Rep., 607.

On question that proof in such case is limited to the fact of indictment, etc.: Kirksey v. State, 61 Texas Crim. Rep., 641, 135 S. W. Rep., 577; Goad v. State, 52 Texas Crim. Rep., 444, 108 S. W. Rep., 680; Choice v. State, 54 Texas Crim. Rep., 517, 114 S. W. Rep., 132; Howard v. State, 53 Texas Crim. Rep., 378, 111 S. W. Rep., 1038; Diseren v. State, 59 Texas Crim. Rep., 149, 127 S. W. Rep., 1038.

When a witness is discredited by being compelled to testify on cross-examination to indictment or conviction, he may testify on re-examination that he has been acquitted or that he was not guilty of the offense charged, but such explanation or exculpation is limited to his own testimony: Tippett v. State, 39 S. W. Rep., 120; Scott v. State, 47 S. W. Rep., 531; Howard v. State, 53 Texas Crim. Rep., 378, 111 S. W. Rep., 1038; Diseren v. State, supra; Shearman v. State, 1 Texas Crim. App., 215.

On question of manslaughter: Wadlington v. State, 19 Texas Crim. App., 266, and cases cited in the opinion.

*C. E. Lane,* Assistant Attorney General, and *E. T. Branch,* for the State.—On question of cross-examination of witness as to specific acts of violence of deceased: Hysaw v. State, 69 Texas Crim. Rep., 562, 155 S. W. Rep., 942, and cases cited in opinion.

On question of manslaughter: Alexander v. State, 63 Texas Crim. Rep., 102, and cases cited in opinion.

On question of cooling time: Miller v. State, 27 Texas Crim. App., 63; Thomas v. State, 49 Texas Crim. Rep., 638; Jay v. State, 52 id., 567; Jay v. State, 56 id., 111.

HARPER, JUDGE.—Appellant was prosecuted, charged with the murder of A. P. Duncan.

The record would disclose that appellant was at work for the Waco Machinery and Supply Company; that Mr. Duncan was president and general manager of this company, and that the killing grew out of their relations as employer and employe. Appellant testified that on the morning of the difficulty Mr. Duncan told him he wanted him, appellant, to make a trip, termed a "missionary trip," when appellant replied he would not have time to see "many of them between trains," when Mr. Duncan asked "what he meant." Appellant then says: "I told him that I would not have time to see many of them and get back between trains and not stay all night. He says, 'Damn it, stay all night.' I says, 'Mr.

Duncan, that is not my contract with you; my contract with you is to stay at home every night unless there is a special deal on; if that is just a missionary trip I can't say, because that is not the contract.' He says, 'Is that what to expect of you?' I said, 'Yes, sir.' He says, 'I will let you know in fifteen minutes what we expect of you.' . . . In about ten minutes Mr. Duncan came out and asked, 'Where is Johnson?' He says, 'Over here.' He says, 'Tell him to come here.' I went ahead then and went around there and went back in his private office. I went in his private office and Mr. Duncan says, 'I don't think we can use you.' He says, 'We don't think you can make the house any money and stay at home every night, and travel these close towns.' I says, 'Mr. Duncan, that is the trade I had with you.' He said, 'It's a damn lie.' I said, 'Mr. Duncan, if I was as big a man as you are you couldn't talk to me that way, but I am a small man.' He says, 'Yes, you are damn small.' I says, 'I am a gentleman.' He says, 'No part of a gentleman.' I says, 'I am just going to carry out my contract with you or I am going to quit.' He says, 'You are damn lie; you ain't got no contract like you say you have.' I says, 'Yes, I have got a contract like that.' He says, 'If you deny my word again I will mash your nose all over your face.' I started to get up and he looked at me awful vile, and I thought he was going to do me some harm. He looked like he had daggers in his eyes. I thought he was going to do me some harm, severe harm. He says, 'If you move I will stamp you through the floor.' It went all over me and I could not move. So while I was trying to control myself, he says, 'Go on now and get out and make us money and make money yourself.' I says, 'Mr. Duncan, I will fill my contract.' He says, 'You have no such contract.' I says, 'I have.' He says, 'You are a damn liar.' I was still afraid to get up. He says, 'How many towns can you make and get back here in a day?' I says, 'I can make Hillsboro, West, Abbott, Elm Mott,' and went on and named a lot of them that I could make and be back at home at night. He says, 'Go get a piece of paper and make out a list of those towns that you can make and make money and be back home every night.' In a few moments Mr. Duncan came and asked me if I had the list made and upon my replying that I had and gave it to him, he said, 'We will let you know in about ten minutes.' Then Duncan walked in the office where his son Bruce and Mr. Martin were, and in a few minutes called me, and said: 'We have agreed that you can't make these towns and make us any money at the salary and expense you will be at.' I says, 'Mr. Duncan, I can't work for you people and stay away from home at night. I want to fill my contract.' He says, 'It's a damn lie; you have no such contract as you say you have.' I jumped up right straight. I said, 'I want some witnesses to this conversation.' I opened the door and moved three or four steps and Mr. Duncan said, 'Come back here; you don't need any witnesses.' And he said that in a very severe voice. I did not know hardly what to do, under the spell I was before, I came back. And when I got back I did not want to sit down because I thought if he went to do anything I would have room to go. So I did not sit

down. I got back and put my foot in my chair just like this; put my foot on the chair this way and stood there and talked to him. He says, 'You can go ahead and take this list of territory and try to make us money, and see if you can do it; go ahead and take it.' I said, 'That is a different contract from what I had to fill.' He says, 'You are a damn lie; you had no such contract as you are talking about.' I says, 'Mr. Duncan, if I was as big a man as you are, I would resent that.' He says, 'You are a damn lie and there is no part of a man in you.' He said that awful hard. He said it threatening to me. I did not know what he was going to do. I says, 'Well, I want to fill my contract, or I am ready to quit.' He said, 'You have no such contract'; and he said, 'Sit down.' I said, 'No,' and he said, 'You damn lying pimp, sit down,' and said it in an awful way. He says, 'You damn lying son-of-a-bitch, sit down.' And he came at me that way. And I jerked my gun out of my pocket and shot him. As quick as I shot him I ran. I ran out the front way and went around Franklin Street and came up to the courthouse. I wanted to give up. So when I got here I gave my gun to some man—I do not know who he was—in the office. I told the man, 'I guess I have killed Mr. Duncan.' I shot Mr. Duncan because he was threatening, and I knew he meant some harm. He raised up and looked like he attempted to do me some bodily harm, and some deathly harm. I shot because I thought he was going to kill me. He was able to kill me with his naked fist. He could have killed me even with his hands. I think one blow would have fixed me. And he came at me in such a threatening manner—I can not hardly realize a man could get in such a passion as he looked when he came at me—I thought that very minute that he was coming at me to assault me then. I think so yet. I was excited at that time. I was so much excited I did not know what I did. I do not know how many times I shot, I was afraid of Mr. Duncan." He further testified that Mr. Duncan got up and glanced at the table on which there were some paper weights, ink bottles and cabinet cases, and he acted as if he was going to get some of those things and hit him with them. That he believed Mr. Duncan could kill him with them; he thought his life was in danger, and for this reason he shot. Duncan was shot in the back of the right hand, the left elbow was broken; he was shot in the left side, and in the back, the wound in the side being the fatal wound.

Bruce Duncan, Mr. Martin and others testified for the State, and would make a plain case of murder, when appellant was in no danger, actual or apparent. We have copied extensively from his testimony, as, in passing on the alleged errors in the charge, the matter must be viewed as it reasonably appeared to appellant at the time, and not as the matter might be viewed at a later time. Mr. Martin says that the last thing the deceased said to appellant was: "Now, Johnson, if you want to be a man and go out on the road and make this work and want to try it and make good on it go ahead and get out and do it." That he then raised up in his chair, with his hands folded on his breast, as was customary

with him, and he, witness, thought the whole matter was dismissed. That he, Martin, turned to his desk, when Johnson fired and continued to shoot until Mr. Duncan fell. Bruce Duncan, in substance, testifies to the same thing. They admit that during the conversation Mr. Duncan did call Johnson a "dirty liar" and "a damned liar" about the contract, but he at no time made any demonstration as if he intended to harm Johnson, and made no threatening move or gesture of any character.

The court instructed the jury on the issue of self-defense:

"A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual *danger*, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

"If from the evidence you believe the defendant killed the said A. P. Duncan but further believe that at the time of so doing the deceased was about to make an attack upon him, or the defendant believed he was about to make an attack upon him, which, from the manner and character of it, and the relative strength of the parties and the defendant's knowledge of the character and disposition of the deceased, viewing the same from the standpoint of the defendant, caused him to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation or fear, the defendant killed the deceased, then you should acquit him, or if you have a reasonable doubt thereof, you will acquit him."

This aptly and directly applied the law to the defensive theory as made by defendant's testimony. He and his testimony alone injected the issue of self-defense; he testified that deceased was a large, heavy man, of an overbearing and ungovernable temper, and he had been informed of numerous difficulties in which deceased had been engaged, etc.

On the issue of murder in the second degree the court instructed the jury: "Now, if you believe from the evidence beyond a reasonable doubt, that the defendant, Alex Johnson, with a deadly weapon, and that the same was a gun and an instrument reasonably calculated and likely to produce death by the mode and manner of its use, in a sudden passion, aroused without adequate cause as adequate cause will be hereinafter explained, and not in defense of himself against an unlawful attack, real or apparent, reasonably producing a rational fear or expectation of death or serious bodily injury, and not under circumstances which would reduce the same to manslaughter, with intent to kill, did unlawfully and with implied malice aforethought, on or about the 18th day of March, 1912, shoot and thereby kill said A. P. Duncan, as charged in the indictment, you will find him guilty of murder in the second degree and assess his punishment at confinement in the penitentiary for any period that the jury may determine and state in their verdict, provided it be for not less than five years."

Appellant contends that this charge shifted the burden of proof and required him to prove "beyond a reasonable doubt that he acted in self-defense," etc. The language used is not subject to such construction, for it required the jury to find beyond a reasonable doubt that *he did not act in self-defense*, etc., before they would be authorized to convict.

Appellant complains most vigorously of the charge of manslaughter as given by the court. We think the court erred, if he erred. at all, in submitting manslaughter to the jury under the testimony in this case. What testimony is there that raised the issue of manslaughter? It is true that appellant testified he was "excited" by the insulting words and gestures of the deceased, but what fact does he testify to that would be "adequate cause" under the statute to create this excitement? If the facts as stated by appellant are true he would have been justified in shoot-. ing. If these facts are not true, there is no fact or circumstance in the case that would in law be deemed "adequate cause" to excite him. Excitement alone will not reduce an offense to manslaughter. The testimony outside of appellant's would show that deceased called him a "dirty liar" or a "d—n dirty liar." Appellant says he called him a "lying s—n of a b—h," but our statute (art. 1131) says: "Insulting words or gestures are not adequate causes." In Eggleston v. State, 59 Texas Crim. Rep., 542, this court said:

"Complaint is made in the motion for new trial and before this court that in submitting the issue of manslaughter to the jury the court did not submit all the law with regard to manslaughter, and in the charge that was given the court omitted some of the elements of manslaughter, and for that reason, together with the failure of the court to give the requested instructions asked by appellant with regards to manslaughter, error prejudicial to the appellant was committed by the trial court. A most careful review of the testimony in the case demonstrates to our minds that there is no manslaughter in this case. The theory of the State was that the defendant had become incensed at the appearance of the deceased upon the ground and his advice to the negroes to stop playing, and regarded same as interference with his purposes on that night, and fearing that the deceased might have the parties arrested, he concluded to provoke a difficulty with the deceased, for the purpose of killing him, and the evidence on the part of the State shows a killing without any excuse whatever. While on the part of the defendant, if his story is to be believed, it is a clear case of self-defense. It seems to be the impression with some members of the bar that in all cases where self-defense arises that necessarily manslaughter is in the case, but this is not a correct interpretation of the law. It would be wrong for the court to submit an issue not raised by the testimony, and as manslaughter could not, from any possible view of the facts, as detailed in the trial of this case, be suggested, we think manslaughter is not in the case. Therefore, if manslaughter is not in the case, any errors of the trial court in its charge on this subject could not avail the appellant, as said charge in submitting this issue was favorable to the appellant

and would give the jury an opportunity to find the appellant guilty of a lower grade of homicide than murder in the said degree."

Thus it is seen if there should be error in the charge on manslaughter, that issue not being in the case, it would present no error. Are we correct in holding that manslaughter is not in the case? In the cases of Simmons v. State, 23 Texas Crim. App., 653, and Levy v. State, 28 Texas Crim. App., 203, it is held that to call a man a son-of-a-bitch or damned son-of-a-bitch, is not adequate cause to reduce an offense to manslaughter. In Boyett v. State, 2 Texas Crim. App., 93, it is held that insulting words alone are not adequate cause to reduce an offense to manslaughter. In Barbee v. State, 34 Texas Crim. Rep., 129, it was held that to call one a "son-of-a-bitch" and charging him with attempt to rape, would not be adequate cause. In Timon v. State, 34 Texas Crim. Rep., 363, that grossly insulting words might be introduced in evidence in mitigation of the punishment, but would not reduce the grade of the offense. In the case of McKinney v. State, 8 Texas Crim. App., 626, this court held: "To make such killing manslaughter, there must actually have existed not only such state or emotion of the mind but the *adequate cause* which produced them must also exist. (Penal Code, art. 602.) Insulting words or gestures, or an assault and battery so slight as to show no intention to inflict pain or injury, may be sufficient to cause the emotions of the mind known as anger, rage, sudden resentment, or terror, to the extent even of rendering it incapable of cool reflection, and yet a killing under such circumstances would not be manslaughter. Why? Because such insulting words or gestures, or such assault and battery, *are not adequate causes* (Penal Code, art. 596), and manslaughter can not be predicated upon any voluntary homicide upon sudden passion not arising from *an adequate cause.*" Neyland v. State, 13 Texas Crim. App., 536; Hill v. State, 11 Texas Crim. App., 456; Blackwell v. State, 29 Texas Crim. App., 194. In the case of Clore v. State, 26 Texas Crim. App., 624, the evidence shows the parties had one difficulty; which apparently was amicably settled; they started home in a wagon, when they commenced quarreling and cursing, and Clore said, "I will take it no longer" and struck. Held not to be adequate cause. In Treadway v. State, 65 Texas Crim. Rep., 208, 144 S. W. Rep., 655, and Kelly v. State, 68 Texas Crim. Rep., 317, 151 S. W. Rep., 304, we have recently had occasion to review the decisions of this State on this question, and it has always been held that if there be no legal "adequate cause" to produce the state of mind, such as anger, rage, sudden resentment or terror, even if such state of mind does exist, the offense is not manslaughter, but murder in the second degree. Take the evidence of appellant alone, and in passing on the question of whether or not there is manslaughter in the case, we must take the evidence offered in his behalf, there is nothing shown but that deceased cursed him and used insulting language towards him. No gestures or other acts of any kind, until appellant says that when he arose from the chair, he looked as if he was going to get something off the table, advancing towards him, threat-

eningly, and from his acts and conduct, he .thought his life was in danger. If this presents self-defense, certainly these same acts do not present adequate cause to reduce the offense to manslaughter. There may be and often are cases in which manslaughter and self-defense are both ·presented, but in a case like this, where nothing is shown but insulting language, until the overt act which if true would make a case of self-defense, the "adequate cause" to reduce the offense is lacking. And if error there be in the charge on manslaughter, this being an issue which he was not entitled to have submitted, but which the court did submit and thereby authorize less punishment than appellant received, it is a matter about which he will not be heard to complain. The other criticisms of the charge we do not deem it necessary to discuss for they present no error.

There are a number of bills of exception in the record relating to the admission and rejection of certain testimony. The first bill relates to admitting the clothing of deceased in evidence. The bill is approved by the court with the following qualifications:

"That there was no objection by the defendant to any of the testimony given by the witness, Dr. Connally, in regard to the examination of the clothing by said witness; that while the witness, J. W. Hale, was upon the stand, and while he was engaged in examining the clothing worn by the deceased at the time of the killing, the defendant made the following objections thereto:

" 'We object to a rehash of this here. There is no dispute between these two doctors as to what the conditions were. The defendant has not cross-examined the first doctor about that, and there is no use of waving all this stuff around here.' We think it is prejudicial and unnecessary. The court stated he could not anticipate what question the county attorney wanted to ask. Mr. Neff, county attorney, stated, 'I am fixing to put the coat on.' The court stated, 'Go ahead.' Mr. Williams, counsel for defendant, stated, 'We except for the reasons stated.' No other objection was made to this proceeding.

"There was a controversy in the trial of this case as to the position in which the deceased was standing at the time the shooting took place. The defendant contending that he was rising from his chair and gotten nearly erect with right hand extended slightly to right toward desk and the State contending that deceased was standing erect with arms folded, and while there was no controversy between the physicians as to the place in the body which the wounds entered, nor the position of the wound on the body, as considered in connection with the entrance of the bullet holes in the clothing at the various places, it was the opinion of the court that the holes in the clothing were material in order to enable the jury to decide upon the issue made between the State and the defendant as to the attitude and position of the deceased at the time and during the shooting, and with these qualifications this will be allowed."

As approved the court did not err in the premises.

The next bill relates to a question propounded by defendant to wit-

ness, A. M. Martin. This bill shows the following proceedings: "I will ask you the question, was not Mr. Duncan at the time he arose from his chair commanding or demanding Johnson to sit down? to which the county attorney objected, and the court sustained the objection, to which action of the court Mr. Williams, counsel for the defendant, replied as follows: 'We except to the ruling of the court.' The court replying: 'There is no objection to asking what was said,' to which Mr. Williams, counsel for defendant, replied, 'I can not form my questions that way and get at what I am driving at, your honor. As I understand it your honor sustains the objection to that question.' The court says, "There is no objection to asking the witness any question you want to lay a predicate for, by what was said by either party at the time.'" This bill presents no error.

In the next bill it is shown that Miss Fáy Bolger testified she could not remember the language used by the deceased on the occasion he received the mortal wound, and also testified that she could not give the substance of such language, when defendant asked her if the "language used was vile and profane." The bill shows she would have answered, "That it was profane." The court held that what one person might term "profane language," might not ruffle another; that some people are more sensitive than others; that this was a question for the jury to determine. As all the witnesses present, both for the State and defendant, state that deceased did call appellant "a dirty liar," and "a damned liar," which language to a young lady's ears would be profane, the bill presents no error.

Appellant testified that prior to the killing he heard that some years ago "that Mr. A. P. Duncan and Silas Duncan killed a man in Grimes County. I could not remember who told me that. I heard it down in that country. I heard that they were indicted for that offense. I heard that Mr. Duncan and his brother were indicted in Grimes County for murder. According to my information Mr. Duncan had lived somewhere in Grimes County. He had lived in Calvert. He had been in business there. He had also been in business at Bryan. That information that I received was talked two or three times with me. I just got that information from talking with the general public there. Such people as oil-mill men are generally thrown with.

"I heard that in Calvert Mr. Duncan had knocked a man down with an axe handle. I heard that Mr. Duncan had some trouble at Temple with Mr. Hollingsworth in the hardware business. I heard that that trouble got so serious that one of them had to quit business. And that Mr. Duncan sold out and quit business and went back to Calvert. I understood that there were pistols in connection with the business at Temple. I did hear of that matter.

"I think the next trouble I heard that he had was in the Exchange Bank here. I heard that he and Mr. Eddins carried guns for each other for a while and that they liked to have had a fight and they had to

separate them at a directors meeting there one time. That was at the Exchange National Bank here in Waco.

"The next incident I heard of was a matter that happened in Dallas. It was a general rumor up there and on the road. That was before the killing. It was some two or three years ago. I went to Dallas on some business and while I was up there I was talking with some one about the Duncan-Hobson Electrical Company and the trouble Hobson had with Duncan in business there. They said they had to get rid of Duncan.

"The next incident, some time I believe, in December, the latter part of December, just before the first of January, Henry Bell told me that he expected that I would have to work for Duncan next year. Judge Kelly here was my lawyer on some business matters such as abstracts, and I was up in his office one day and I said: 'I expect I will go to work for Mr. Duncan before long.' I had put all the money I had saved in investments such as lots here in town. When I was up there talking to Judge Kelly I told him I understood nearly everybody else had had trouble with Duncan but that I had never had any trouble with anybody. Judge Kelly remarked that Mr. Duncan made a bad break in his office one day. I believe Mr. Kelly was representing Mr. Duncan in some business, and Judge Jenkins was representing Mr. Cramer, about a lease of a hotel of some kind. Mr. Kelly said Mr. Dunan got in the worst rage he ever saw a man there in his office. And he said if Judge Jenkins had not gotten between them there would have been a fight right there and maybe a killing. He said he never saw such a wild man in his life as Mr. Duncan was. I said I did not know why I could not get along with him, that I had been working for fifteen years, and that I had gotten along with everybody that I had ever worked for.

"About the time of the killing or before it, Mr. Duncan had some trouble with some carpenters there about some frame work out in front of the building. It seems that they had been a long time getting this work done and there was a lot of frame work out in front and it was a little hard to get out at the front, and Mr. Duncan went out and jumped on the carpenters and told them if they did not tear that down he would get some men and tear it down himself; that he was not going to have it any longer. That he was not going to have it up there any longer at all. I think that morning before this trouble took place they were talking something about lowering the floor there in front.

"Taking the information that I had and Mr. Duncan's conduct toward me that morning, I regarded Mr. Duncan as a dangerous man when he got mad. I regarded him as mad that morning."

He then offered to prove by Mr. Hollingsworth the details of the difficulty between him and Mr. Duncan; by Mr. Baker the details of the difficulty about the repair of the front of the building; by Mr. Twaddell the details of a difficulty with one Costello, etc. It was permissible to show, and the defendant was permitted to do so, that he heard of these various altercations, and if he desired to do so that they did occur, but it was not permissible to go into the details of those transactions.

To try the merits of these extrinsic matters would detract the minds of the jury from the merits of the case then being tried, and be conducting a half dozen trials at one time; the fact that appellant had been informed that such matters occurred was admissible; that they did occur could be proven, but it was not permissible to go into details of these transactions and the court did not err in so holding.

The appellant not being satisfied with testifying that he had been informed that deceased had been indicted for murder in Grimes County some twenty-five years prior thereto, he called the district clerk of that county as a witness and introduced the records, and showed the deceased had in fact been indicted for murder. When these records were introduced the State in rebuttal offered S. D. A. Duncan as a witness who testified that his brother, deceased, when tried was acquitted, and testified that he was present when the killing took place, and that his brother took no part in that difficulty. When this testimony was offered appellant stated:

"'We object, your honor, to any testimony from this witness or from any other source as to what he and his brother did, or whether they had a difficulty or whether they did not.' We introduced in evidence a record showing that he and his brother had been indicted upon a charge of murder.

"That defendant had heard of that; as affecting the impression that defendant had a right to have of the deceased, Mr. Duncan. Now as to what grew out of that as to whether he was finally acquitted or as to how far he was actually involved I do not know and defendant did not know it. Therefore, could not have affected him nor the purpose for which this testimony is offered. The impression was made by the fact that he had been indicted for murder and the defendant affirmatively testified that he had heard that fact that Mr. Duncan, deceased, had been indicted and that he did not hear what had become of the case, and what was the final result of the trial in the case. For these reasons we object to the introduction of any testimony along that line."

These were all the objections offered to the testimony of S. D. A. Duncan and W. W. Meacham. Had appellant relied on what he had heard as affecting the impression made on his mind, this testimony would not have perhaps been admissible, but as he went further and introduced the record to show that Mr. Duncan, deceased, was in fact indicted for murder as affecting the reputation of the man, and to show that he was a violent and dangerous man, and would commit murder, then the testimony that Mr. Duncan did not in fact participate in the killing and was acquitted became admissible. The details of this matter further than that should not have been gone into, and had appellant objected thereto, doubtless the court would have sustained the objection as he did in the other instances. At least as no such objections were offered in the court below at the time the testimony was adduced, we can not review the matter in this court.

In rebuttal the State also introduced evidence that the general repu-

tation of A. P. Duncan was that of a peaceable, law-abiding citizen. This was objected to by the defendant, he claiming that he had not attacked the general reputation of the deceased in these respects. If a record ever disclosed that a decedent was attacked as being of violent, high-tempered, dangerous and overbearing man, this record discloses such attack, and appellant testifies to hearing of all these matters prior to the killing, and that this reputation of deceased, was in his mind and had its bearing on his conduct at the time of the shooting. The court committed no error in admitting this testimony. The bill shows:

"It is further shown that the defendant testified that he had been informed of incidents showing on the part of Mr. Duncan, the deceased, an uncontrollable temper and violence toward other persons, and that he had been informed of these incidents prior to the homicide, and the incidents testified to by the witness, were as follows, towit:

" 'That one time on a trip to Calvert, Bremond and Hearne, he had been informed that the deceased, A. P. Duncan, and his brother, Silas D. A. Duncan, had killed a man in Grimes County and had been indicted therefor.

" 'That he had also heard that in Calvert deceased, A. P. Duncan, had knocked a man down with an axe handle.

" 'That he had heard deceased had some trouble at Temple with Mr. Hollingsworth in the hardware business, and had heard that the trouble got so serious that one of them had to quit business, and that the deceased sold out and quit the business, and went back to Calvert, and he further understood there was pistols in connection with the business at Temple.'

"Witness further heard that there was trouble in the Exchange Bank at Waco, and the deceased and one Mr. Eddins carried guns for each other for a while, and they liked to have had a fight and had to be separated at a directors meeting at the Exchange National Bank in Waco.

"Defendant further testified that while in Dallas on business he had heard that deceased had trouble with one Hobson with whom he was in business there, and that the said business was the Duncan-Hobson Electrical Company, and that they had to get rid of Duncan.

"Defendant further testified that Judge Kelly in Waco, in a conversation about him having to work under deceased, A. P. Duncan, remarked that deceased made a bad break in his (Kelly's) office one day. That Mr. Kelly was representing the deceased in some business and that Judge Jenkins was representing one Mr. Cramer about a lease of a hotel. That Mr. Kelly said deceased got into the worst rage he ever saw a man, there in his office, and if Judge Jenkins had not gotten between them there would have been a fight right there, and maybe a killing, and Judge Kelly said he never saw such a wild man in all of his life as deceased was. That defendant said, in reply thereto, that he did not know how he would get along with deceased, but that he had been working for fifteen years and had gotten along with everybody he had worked for.

"Defendant further testified that about the time of the killing deceased had some trouble with carpenters about some frame work in front of the building and that the deceased went out and jumped on the carpenters and told them if they did not tear that down he would get some men and tear it down himself, he was not going to have it there any longer." And then introduced other witnesses to prove that many of these things did in fact occur as stated by him.

The other matters complained of in the record we do not deem it necessary to discuss further than the two bills relating to the remarks of the prosecuting officer, Mr. Neff. In one bill, some nine pages of typewritten matter, nearly all, or a great portion of the speech of Mr. Neff, apparently is copied. In this bill No. 12 no specific matter is complained of, and the complaints are too general to be reviewed. However, we will say, lengthy as it is, we have read the entire bill. and do not think it contains any matter of which appellant could justly complain. To take an isolated sentence, and not its connection and bearing, objections might be urged, but when we take all the remarks, they were within the record, and while in some instances, rather caustic, yet no error is presented. However, in bill No. 13, it is shown that in his closing remarks Mr. Neff said: "Next they introduced to the jury some evidence that about twenty-five years ago A. P. Duncan, while in business in Calvert, hit a man over the head with an axe handle. They bring the man here from far off New Mexico, to show that this incident took place. The man who was hit, of course, says that he was doing nothing. We got out of him, however, that the difficulty arose about collecting a debt that this man owed the Duncan house. We know nothing of this man who re-. fused to pay this debt, and the attorneys for the defendant would not permit us to prove that this same man was indicted in Robertson County about this time for the high offense of swindling." That part of these remarks, "the attorneys for the defendant would not permit us to prove that this man was indicted in Robertson County about this time for the high offense of swindling," was improper. When the court sustained an objection to this testimony, he should have severely reprimanded Mr. Neff for thus attempting to get this evidence before the jury. The court at the request of appellant did instruct the jury: "You are charged that you must not consider any remarks of the county attorney to the effect that the witness Bainum had been indicted in Brazos County. There is no such evidence in this case and the county attorney acted improperly in making the assertion." The court having given such instructions to the jury, the remarks were not of that hurtful and harmful character as to present reversible error.

We have carefully reviewed this record; studied the able and interesting brief filed by appellant's counsel, but after carefully considering the entire record we are of the opinion that appellant has had a fair and impartial trial; that no error was committed in admitting testimony before the jury, and that the court, in his main charge, and in the special

charges given at appellant's request, fairly and fully presented the law of the case.

The judgment is therefore affirmed.

*Affirmed.*

### ON REHEARING.

#### June 10, 1914.

HARPER, JUDGE.—Appellant has filed a motion for rehearing, and an able and exhaustive brief in support thereof. There are a number of questions presented, but the one seemingly most relied on by appellant is the one in which it is insisted that this court erred in holding that manslaughter was not in the case, taking the testimony of defendant, and all the testimony into consideration. His first contention is that, as in the Wadlington case, 19 Texas Crim. App., 266, it was held, "That insulting words or gestures or assault and battery so slight as not to inflict pain or injury, or an injury to property, unaccompanied by violence, are not adequate cause, but though no one of these causes alone and independent of the others can be deemed adequate cause to reduce a homicide to manslaughter, yet if they all combine and exist conjointly with each other they may thus united become adequate cause," the facts in this case present such a combination of circumstances as would constitute adequate cause, and, secondly, that the facts show that deceased was guilty of falsely imprisoning appellant on the occasion; but that if the facts do not show that conclusively, then the evidence does suggest that he may have been guilty of falsely imprisoning appellant, and refers us to the cases of Herring v. State, 3 Texas Crim. App., 108; Woods v. State, 3 Texas Crim. App., 204; Maner v. State, 8 Texas Crim. App., 361, and Staples v. State, 14 Texas Crim. App., 136, as sustaining the proposition that the issue of false imprisonment is in this case. These are the two propositions and authorities upon which appellant relies to show that manslaughter was in the case. Appellant's testimony is quoted almost in full in the original opinion, and which he concedes is a fair statement, yet he says we ought to have gone further and stated that appellant was a small man and deceased a large man, and that he was overbearing in his demeanor and conduct.

Does Mr. Johnson's testimony raise the issue that he was falsely imprisoned by deceased? He says deceased had called him a damned liar about a contract; that when he insisted he had such contract deceased said, "If you deny my word again I will mash your nose all over your face." That he started to get up when deceased looked at him "awful vile—like he had daggers in his eyes," and he thought deceased was going to do him some severe harm, and deceased added, "If you move I will stamp you through the floor," and then added, "Go on now and get out and make us money and make money yourself." After some more talk about the contract he went out and made a list of towns as suggested. Under that state of facts if deceased were alive, and the State was prosecuting him for false imprisonment, would

this court let a conviction for such offense stand? If so, the issue was raised; if it would not because the testimony was insufficient to sustain such conviction, then the issue was not raised, for there is not the slightest other testimony in the record that would tend to show false imprisonment. What unlawful detention was there of appellant? The deceased did say once, as he went to get up, "If you move I will stamp you through the floor," immediately adding, "Go on now and get out and make us some money and make money yourself," and in a few moments he did go on. It is true there were heated words over a contract, and deceased did call him a damned liar, but there was no detention of appellant against his will, and none of the cases cited by appellant sustain his contention. In the Herring case, supra, two men had gone to the witness' house between the hours of 10 and 11 o'clock at night, called him out of his house, cursed him, and made him admit lying; had pistols with them, and made the witness admit he was a lying s——n of a b——h. Their mission was an unlawful one, and he was detained through fear, the other men being armed.

In the Woods case, supra, Kaufman and Woods both claimed a piece of land. Four men, the appellant Woods, and his father and two brothers went to the farm where Kaufman was plowing and forbade him plowing, and said if he did plow he would have to plow over him, holding a cocked gun in his hands. Bill Woods had a cocked pistol in his hands, and by these means prevented him from plowing. It is thus seen by the use of arms and threats he was unlawfully prevented from plowing land in his possession.

In the Maner case, the appellant and two others went into the woods to find Ferris Pharr. When they found him they produced a written instrument (a lie bill) and in an angry and menacing manner required him to sign it. He asked to be allowed to go and show it to his brother before signing, but in a peremptory and threatening manner he was refused permission. Pharr says he thought he saw a pistol, and being out-numbered and apprehensive, he signed it. Witness' brother, afterwards learning of this, went to the appellant and his companions and asked to see the paper his brother had signed, and said if he had been present his brother would not have signed it, when the appellant replied that he intended it should be signed, and if necessary he would have collared Pharr and forced him to sign it, and that somebody would have been killed if he had not signed it.

In Staples v. State, supra, the father of the person assaulted, with another, went with a deputy sheriff and arrested the man and carried him to the county seat, and delivered him to the sheriff where he was compelled to give bond to secure his release. This was held to be an unauthorized arrest, and the facts further showed that the appellant had not been summoned to go by any officer, but had asked the officer to go with him without swearing out a complaint. These are all the authorities cited by appellant, and none of them are applicable to the facts in this case as hereinbefore shown. Our statute provides that the detention

must be wilful. Wilful is defined to mean that the act done must be with evil intent or legal malice. Every detention is not false imprisonment, even if it should be held that deceased detained appellant against his will, which we do not think the facts show. Certainly the facts do not show that he detained him with any evil intent, and if appellant had gone away when he was told to do so, not remaining longer to discuss his contract of his own volition, there would have been no false imprisonment and no killing, and if deceased was alive and being prosecuted for false imprisonment, we would hold the facts did not show an unlawful and wilful detention, and, therefore, that issue was not in the case. In the first three cases cited by appellant there was unlawful detention for an illegal purpose, as shown above; in the last case there was an unlawful arrest, and a carriage away from home, and manslaughter could not be predicated upon unlawful imprisonment in this case, for the evidence does not present that issue.

The record does not disclose the deceased prior to the day of the homicide had ever said an unkind word to or about appellant, or entertained towards him the least ill-will. A disagreement arose over the terms of a contract appellant claimed to have made with the predecessor of deceased as officer in the Waco Machinery Co. Appellant said he had a certain kind of contract; deceased claimed he had no such contract; appellant insisted he had, when deceased called him a damn liar, and when appellant attempted to get out of a chair deceased said he would stamp him through the floor, and if he denied his word again he would mash his nose. These are all the threats of any character appellant testified to. Article 1131 provides "That insulting words or gestures, or an assault and battery so slight as to show no intention to inflict pain or injury are not adequate causes to reduce an offense to manslaughter." In this case there was no assault and battery of any character; not a blow was struck by deceased; he did not even touch appellant. All there is claimed took place on this occasion, deceased used insulting words; he threatened violence if appellant again disputed his word, and then appellant says that later deceased did make a threatening gesture. It is certain he got no further, then the lead began to belch from appellant's pistol. The State's witnesses say there was no threatening gesture; appellant, and appellant alone says there was, and he says that deceased reached for instruments with which he thought deceased was going to kill him. This presented self-defense. This is not a case where a combination of the State's testimony and the defendant's testimony might present adequate cause. The State's case makes a case of deliberate murder; the appellant's testimony would make a complete justification. If there was no gesture, there was no adequate cause; if there was, it was such a gesture as justified the homicide under appellant's testimony. Ford v. State, 50 S. W. Rep., 350; Jirou v. State, 53 Texas Crim. Rep., 18; Dougherty v. State, 59 Texas Crim. Rep., 464.

We thoroughly agree with the rule of law as laid down in the case of Wadlington, supra, cited by appellant, that where there may be a

combination of causes, although neither one in and of itself would be statutory adequate cause, which would reduce an offense to manslaughter, yet all combined they may do so, but the Wadlington case does not sustain appellant's contention under the evidence in this case, but sustains the original opinion. Contat, the witness in that case, testified that the defendant called him a damn lie twice, having his hand in his pocket on a pistol; after more talk the defendant charged witness with threatening to kill him, which was denied, when the defendant began to pat him on the back. The court in that case says these facts would *not be adequate cause* to reduce an offense to manslaughter, but says the testimony excluded, by which the defendant offered to prove that the charge of improper conduct towards the wife and child was untrue, was admissible, and if these additional facts had been admitted, then under such circumstances all of the circumstances would raise the issue. It is thus seen that that case holds that facts herein relied on by appellant, would not be adequate cause to reduce the offense to manslaughter. (See authorities cited in original opinion, and Kelly v. State, 68 Texas Crim. Rep., 317, 151 S. W. Rep., 304; Treadway v. State, 65 Texas Crim. Rep., 208, 144 S. W. Rep., 666, and authorities there cited.) In McKinney v. State, 8 Texas Crim. App., 626, Presiding Judge White, speaking for the court, held: "The proposition stated in the special instruction is not a correct proposition of law; for a killing upon such sudden passion as is mentioned may be murder in the second degree, even though the passion was anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection. To make such killing manslaughter, there must actually have existed not only such state or emotion of the mind, but the adequate cause which produced them must also exist. Penal Code, art. 602. Insulting words or gestures, or an assault and battery so slight as to show no intention to inflict pain or injury, may be sufficient to cause the emotions of the mind known as anger, rage, sudden resentment, or terror, to the extent even of rendering it incapable of cool reflection, and yet a killing under such circumstances would not be manslaughter. Why? Because such insulting words or gestures, or such assault and battery, are not adequate causes (Penal Code, art. 596), and manslaughter can not be predicated upon any voluntary homicide upon sudden passion not arising from an adequate cause."

We have again discussed this question at length that it may be known that we will take the plain mandate of the statute for our guide, and follow it, for while there may be a combination of circumstances and acts which will be adequate cause to reduce an offense to manslaughter, yet if the conduct and acts are of the character and kind that the statute says *shall not* be deemed adequate cause, then manslaughter is not raised, and mere abusive language, if accompanied by an assault, which the whole record shows caused no pain or bloodshed, and is not contended that it did, is not and will not be sufficient to raise the issue of manslaughter, because the statute says it shall not be. And nothing said in the case of Wadlington v. State, 19 Texas Crim. App., 272, conflicts

with this rule of law, for when we take the facts in that case, and the opinion as a whole, it also announces the same rule of law as herein stated and we adhere to the original opinion that the issue of manslaughter is not in the case. However, the court did submit the issue of manslaughter in his charge, and in a way that we think fairly did so as applicable to the facts of this case. The first paragraph complained of reads: "Insulting epithets or words or gestures alone showing no intention to inflict pain or injury are not deemed adequate causes under the law to reduce an unlawful killing from the grade of murder to that of manslaughter; or in other words, sudden passion, though overpowering the reflective qualities of the mind, caused by insulting epithets, or words or gestures alone showing no intention, real or apparent, to inflict pain or injury will not reduce murder to manslaughter." According to the evidence for the State all that deceased did was to use insulting language to appellant—that and nothing more, and under article 1131 of the Penal Code that was but presenting that phase of the law to the jury for their guidance. This was held proper in the case of Hill v. State, 8 Texas Crim. App., 142, where the evidence presents two theories, but it is also held that the converse ought to be presented,—that is, the issue as made by the testimony for the defendant. There was no assault causing pain or bloodshed, but the matters relied on by appellant were that deceased used abusive language, and told appellant if he again disputed his word he would stamp him through the floor, and mash his nose all over his face; that he subsequently used abusive language. This is the sum and substance of the testimony, until appellant says deceased at last arose from his chair, looked vicious and reached for things on the table with which he thought he was going to kill him. This last the court fully presented in the charge on justifiable homicide. Now did the charge on manslaughter submit the issue as made by his testimony fairly? After giving the statutory definition, the court instructed the jury:

"Although the law provides that the provocation causing the sudden passion must arise at the time of the killing, it is your duty in determining the adequacy of the provocation, if any, to consider in connection therewith, all the facts and circumstances in evidence in the case, both before and at the time of the killing, and if you find that by reason thereof the defendant's mind at the time of the killing was incapable of cool reflection, and that said facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law, and so in this case you will consider all the facts and circumstances in evidence, both before and at the time of the killing, in determining the condition of the defendant's mind, at the time of the alleged killing, and the adequacy of the cause, if any, producing such condition.

"The following are deemed adequate causes: Any condition and circumstance which is capable of creating and does create sudden passion,

such as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection, whether accompanied by bodily pain or not is deemed adequate cause. And where there are several causes to arouse passion, although none of them alone would constitute adequate cause, it is for you to determine whether or not all such causes combined might be sufficient to do so."

After so doing he submitted the issue for a finding in a way not subject to complaint. Appellant asked no charge on manslaughter, and complained of the charge for the first time in his motion for a new trial. So if the evidence, by a combination of all the circumstances testified to by appellant, should be held to require the submission of the issue, then the charge as given fairly and fully does so.

Appellant's complaint that the charge is erroneous in instructing the jury, "That the provocation must arise at the time" can not be sustained. The statute so provides, in every case except in case of insult to a female relative, which is fixed at the first meeting thereafter, but in all other cases the provocation must arise at the time. It is true you can look to antecedent matters in judging of and passing on whether the provocation arising at the time, in the light of all the testimony, was such as to produce such a state of mind in a person of ordinary temper.

A charge on cooling time would have been injurious to appellant, and is not such a matter as he will be heard to complain of. By instructing the jury to consider all the facts and circumstances in evidence, it was as favorable as the court could have presented it. Neither at the time of the homicide, nor prior thereto, was there statutory adequate cause testified to by any witness. In a case where statutory adequate cause is in the case, the court should so instruct the jury, and then if the issue of cooling time is in the case, the court should instruct the jury properly in regard thereto. But in this case, no statutory adequate cause arising at any time, the court in permitting and instructing the jury to consider all the facts and circumstances, and in nowise limiting any of the testimony by charging on cooling time, it would be error in favor of appellant, if error it be. Hancock v. State, 47 Texas Crim. Rep., 3.

Appellant also complains of the court failing to charge on threats in connection with the charge on self-defense. The only threats in the case were the two remarks testified to by appellant,—that deceased said to him if he disputed his word again he would mash his nose all over his face, and he would stamp him through the floor. Appellant still insisted that he had a contract by which he was to be at home each night, when deceased told him to go ahead and make out a list of towns he could make, and he, deceased, would confer with Mr. Martin and Bruce Duncan in regard to the matter and see if they could make any money out of such a contract. Appellant went and made the list and deceased conferred with Martin and his son, Bruce, and then called appellant, and they renewed the discussion of the contract and appellant's ability to make the towns he had listed, and whether or not any money could be made out of such an agreement. The State's testimony is that the

deceased got up and told appellant to go ahead and see what he could do. Appellant's is that as deceased got up he looked vile, and made a threatening gesture as if to get something off the table with which to kill him. It is thus seen that there was no cessation of the negotiations between them from the time it began that morning until the fatal shots were fired. It is true the whole negotiations may have covered from forty-five minutes to an hour in time, but the mind of neither of them was detracted or taken away from the negotiations, but their attention was on this matter and this alone. Under such a state of facts, under all the authorities, no separate and distinct charge on threats was called for. The threats were no definite threats, but were indirect in that deceased told appellant if he again disputed his word he would stamp him through the floor and mash his nose. Hancock v. State, 47 Texas Crim. Rep., 3; Armstrong v. State, 50 Texas Crim. Rep., 26.

The other questions involved in the motion for a rehearing are ably discussed in a brief filed by Messrs. E. T. Branch and C. E. Lane, and we take the liberty to copy therefrom the following excerpts:

"In reply to the contention of appellant that the court erred in permitting the State to prove, as shown by his bill of exceptions No. 7, on pages 64 to 80, that the deceased was acquitted of a charge of murder and was not guilty thereof, the State respectfully submits the following:

"Appellant was permitted to prove that deceased had been indicted for murder, and also introduced the indictment in evidence, which testimony was inadmissible: first, because the indictment against deceased was too remote. Proof of specific acts of violence is not admissible to show the character of deceased when the same are too remote. The testimony shows that this happened before appellant was born and while deceased was but a boy. Second, proof of the fact that deceased had been *indicted* for murder was not admissible because such proof would not show a specific act of violence or raise any presumption that the homicide was unlawful because an indictment is not evidence of guilt; and in cases of homicide, indictments are sought for the purpose of clearing the name of the accused while the witnesses are accessible because murder is never barred by limitation. In the case of Nelson v. State, 58 S. W. Rep., 107, the appellant complained of the refusal to permit him to prove that deceased had been indicted for murder in at least two cases, and this evidence was there held inadmissible. This seems to be the only case in this country in which this identical question was presented; but we think on principle it can not fairly be said that proof that deceased was indicted for murder is proof of a specific act of unlawful violence.

"However this may be, and whether or not the evidence is legal or illegal, the State had the right to rebut the inference sought to be drawn therefrom by the appellant and to show the real facts in connection therewith so as to show that said indictment was in fact no proof of bad character. The leading case in the United States so far as we have been able to find, and which we think correctly states the proposi-

tion of law, is Hysaw v. State, 69 Texas·Crim. Rep., 562, 155 S. W.
Rep., 941, in which Judge Prendergast, speaking for the court, says:

" 'The State, in cross-examination of such witnesses, should be per-
mitted to go into the particulars of the specific acts for the purpose of
showing that the deceased was justifiable, or ·of rebutting defendant's
theory that such acts showed him to have been a violent and dangerous
person,' etc.

"In the case of Bullock v. State, 73 Texas Crim. Rep., 419, 165 S.
W. Rep., 196, the court says:     'Whenever the circumstances are such
as to authorize an appellant to introduce such specific acts, the State,
on cross-examination, should then be permitted to go into the particulars
of such specific acts for the purpose of showing that the deceased was
justifiable, or rebut the defendant's theory that such acts showed him
to have been a violent and dangerous person. Such specific acts would
tend to show, and in some instances might show deceased to be a violent
and dangerous man equally or more than his mere general character or
reputation on the point. *Certainly when an appellant is permitted to
attack a deceased, the State should then be permitted, if it. could, to
introduce proof to rebut such evidence.* The lips of the murdered man
are of course closed. He can not testify to dispute or refute such evi-
dence by an accused. The State therefore unquestionably has the right to
meet this proof by showing that the general reputation or character of a
deceased was that of a quiet, peaceable, and law-abiding man when the
reverse is attempted to be shown by an appellant. Among other objects
of our Code, as expressly enacted therein, it is said its object is "to bring
to the investigation of each offense on the trial all the evidence tending
to produce conviction or acquittal." '

"In this case the court also quotes from the case of Hysaw v. State,
supra. We think that from what is said by the court in these two cases
and from the general principles of law, the State should be and was per-
mitted to rebut the inference sought to be drawn by appellant by his
proof that deceased had been indicted for murder and to remove, if it
could, from the scales of justice such testimony of appellant. It is an
elementary principle of evidence and sustained by many authorities in
this State, that whatever facts are introduced that tend to affect the
issue, the opposite side may break the force and effect of such testimony
by showing its falsity or by contradicting or rebutting the inference
sought to be drawn therefrom in any legitimate way. The authorities
cited by appellant are not in point because the State was not attempting
to show matters occurring at the time of the homicide which impinged
on the defense of appellant but was simply explaining the effect and
breaking the force of the inference sought to be drawn from such testi-
mony. And the State's testimony is based on rules clearly distinguish-
able from the authorities cited by appellant in his brief because neither
the State nor the appellant in the instant case was seeking to attack or
sustain the credibility of a witness. Clearly the fact that deceased had
been indicted, even if it were admissible, was subject to explanation so

that no unfair inference might be drawn therefrom by the jury; and this is clearly illustrated by the case of Kemper v. State, 63 Texas Crim. Rep., 1.

"The right of the appellant to prove specific acts of violence of the deceased is an exception to the general rule because ordinarily such fact is provable only by proof of general reputation, and in this case appellant did not bring himself within the exception. But, even if he had, the State is not bound by what the defendant knew or said he knew of the matter, but may show the real facts in relation thereto so that the jury may draw the proper and correct inference therefrom and might meet proof of specific acts of violence alleged to have been committed by deceased by an explanation of the true facts. Otherwise it would lie in the mouth of the party accused of murder to improperly vilify the character of the deceased. The State is no more confined to proof of general reputation than the defendant is when the State is tendered the issue of specific acts; and when in the light of this whole case it is seen that the lowest punishment for murder was inflicted and that the court charged the jury clearly and fairly to the effect that appellant's apprehension of danger must be viewed from his own standpoint, no injury could or did result to appellant from the admission of this testimony.

"In cases where the defendant claims a homicide was committed on account of insults to his female relative, the State has always been permitted to show the truth as to whether or not such insults were in fact made or communicated. Many of these propositions and authorities are found in section 510 of Branch's Criminal Law, and Cameron v. State, 69 Texas Crim. Rep., 439, 153 S. W. Rep., 867, is in line therewith. And while these cases and propositions are not exactly analogous; still they tend to support what is above contended for. And in any event, the testimony admitted and complained of could not fairly be said to operate to the injury of appellant because the same did not tend to help the State's case in proving the guilt of appellant, it not being of any matter that occurred at the time of the homicide but being admitted merely for the purpose of removing an inference sought to be drawn by appellant from proof of a remote indictment against deceased. In the case of Williams v. State, 67 Texas Crim. Rep., 287, 148 S. W. Rep., 763, this court held that if defendant proves threats by deceased and that the deceased was a man likely to execute a threat seriously made, the State might prove by a witness who has been intimately associated with the deceased for years that he had never known deceased to carry a pistol. The State did not become impotent or powerless to prove the truth simply because appellant had proof that deceased had, a long time before, been indicted for murder. Nor do we believe that the bill of exceptions shows *as a fact* that the appellant did not know of the outcome of the trouble and the cause of the trouble. On page 66 of the record appellant says:

" 'I do not remember whether I was told in the same communication the outcome of the trouble and the cause of the trouble. I do not re-

member anything about that. I did not inquire into the cause of the trouble that A. P. Duncan was in. . . . After this matter was told me about the trouble in Grimes County, I did not ask the cause of it and the result of it.' And whether or not he had, we think the rule is correctly stated by Judge Prendergast in the Hysaw and Bullock cases, supra, to the effect that the State may meet proof of specific acts of violence by proof of the real facts so as to show that in fact the deceased was not a violent and dangerous man as contended for by the slayer. And we do not think the State is bound to make this proof by any particular witness and especially in this case where it was impossible for the State to cross-examine the indictment introduced by appellant. And certainly in this case, where no specific act of violence was shown by appellant but only proof that an indictment had been found, the State should have been, as it was, permitted to show the truth in relation thereto. This simply removed the matter from the case and if the jury were intelligent, as it must be presumed they were, the State's explanation thereof did not, in the light of all the testimony in this case, tend either to bring about appellant's conviction or to enhance the penalty assessed against him. Some of the other matters introduced or sought to be introduced in this connection did not show specific acts of unlawful violence or tend to illustrate the character of the deceased or the standpoint of the defendant because appellant did not show that the trouble he heard deceased was in was trouble in which deceased was at fault. Before any proof of specific acts of deceased should be admitted a defendant ought to show that such acts are unlawful and are specific acts of unlawful violence, and that they, when fairly construed, tend to show that deceased was in the wrong and that the acts were such as would indicate that deceased would likely do the things that defendant claims he did, and that such acts would reasonably show a basis for a claim of self-defense.

"When the defendant proves bad reputation for violence of the deceased, the State is permitted to break the force of that testimony by proof of his good reputation in that respect, and we think it equally true that where specific acts of violence are sought to be put in evidence for the purpose of illustrating some issue in the case, or if put in at all, the State is equally permitted to show the truth in relation thereto. We also think that the State is not concluded by this statement of the defendant that he did not know the entire truth or the real merits of the controversy, and that the State may prove the real facts in a question of this kind so as to leave it to the jury to decide as to what, in fact, the defendant did hear."

Of course, as said in the original opinion, none of the testimony as to the details other than that Duncan was not guilty of the offense and had been acquitted, was admissible, but the objection made was that none of the testimony was admissible, and what we intend to hold and do hold is, that that much of the testimony was admissible, and when a general objection is made to testimony, a part of which is admissible, and a

part inadmissible, the court's attention by the objection made must be directed specifically to the inadmissible part of the testimony and exception reserved to admitting the inadmissible part of it. As said in Ortiz v. State, 68 Texas Crim. Rep., 524, 151 S. W. Rep., 1056: "A bill of exceptions is too general for consideration if it includes a number of statements, some of which are clearly admissible, and there is nothing in the objection directly pointing out the supposed objectionable portions of the evidence," citing Branch's Crim. Law, sec. 47; Payton v. State, 35 Texas Crim. Rep., 508; Tubb v. State, 55 Texas Crim. Rep., 606; Cabral v. State, 57 Texas Crim. Rep., 304.

The motion for rehearing is overruled.

*Overruled.*

DAVIDSON, JUDGE.—I can not agree to this decision. I do not purpose going into a discussion of the reasons, but I especially say this case goes too far in admitting details of acts and facts of the homicide said to have been committed by deceased in Grimes County years ago—before this unfortunate tragedy. All the details of that killing, even to minute details, were admitted in this case for the State. In other words, that killing was retried in this case. That carries the rule too far and becomes more than a dangerous precedent. There are other similar matters, but I do not care to discuss them at length. It would be useless in the face of this opinion.