No. 5268.

## Lilly Gibson v. The State.

### ON MOTION FOR REHEARING.

1. Murder—Evidence.—It was competent for the State to prove in this trial for murder that the homicide occurred in a house of prostitution, and that the accused was the proprietress of the house,—as those facts tended in this case to elucidate the *res gestæ*.

2. Same—Practice—Evidence.—The State has the right, on the trial of a criminal case, to anticipate defensive testimony upon a material issue, and may support its theory thereupon by its evidence in chief as well as by its evidence in rebuttal. See the opinion for a case to which this rule applies.

3. Same.—That the trial court is required to compel the State, under all circumstances, to introduce every eye witness to the transaction is a doctrine which has never been announced by this court, and which is not supported by its adjudications in the Hunnicutt case (20 Texas Ct. App., 626) and the Phillips case (22 Texas Ct. App., 139).

4. Same—Evidence.—The State having proved the acts and declarations of the defendant just before and just after the shooting, the defense proposed to prove statements made to a witness by the defendant, twelve days subsequent to the shooting, with respect to her declarations at the time of the shooting, which proposed evidence was excluded by the trial court. It is insisted by the defense that the excluded testimony was admissible under the last clause of Article 751 of the Code of Criminal Procedure, which reads as follows: "And when a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence." *Held*, that the proposed evidence was properly excluded. The rule announced in the said Article can not be invoked in this case, inasmuch as the declarations of the accused at the time of the shooting were proved as *res gestæ* on the trial, and not as detailed declarations. See the opinion on this question.

5. Manslaughter — Charge of the Court. — In the absence of proof showing that the defendant's husband and co-principal, who fired the fatal shot, heard or was informed of the insulting epithet applied to the defendant by the deceased, the trial court did not err in refusing a special charge upon manslaughter.

Appeal from the District Court of Bexar. Tried below before the Hon. G. H. Noonan.

This is the companion case to that of Cliff Cook, which will be found reported in volume XXII of these Reports, commencing on page 511. This conviction was in the second degree for the murder of Wm. M. Russell, in Bexar county, Texas, on the twentieth day of December, 1885, and the penalty assessed against the appellant was a term of five years in the penitentiary. The evidence in the two cases being in large part the same, the statement which follows contains only such additional or different facts as were not proved in the Cook case.

In addition to his testimony on the Cook trial, the witness Bennett testified that when he reached the station house with the deceased, the latter declared frequently that the defendant on this trial did not shoot him, but that she called upon Cook to shoot him, and that Cook did so. This witness was corroborated by Zeigler to the extent that deceased declared that the defendant did not shoot him, but was the cause of his being shot.

The defendant's witness, Breeding, located himself at the house of the defendant at the time of the shooting, and testified that he heard three shots fired, two of which he saw fired by Cliff Cook. He did not know who fired the other shot. Just before the shots were fired he saw the deceased standing on the sidewalk with a pistol in his hand flourishing it about. He also heard the deceased, who was wearing a light colored overcoat, curse the defendant and call her a d—d old whore. He also heard the deceased say to defendant that his pistol was the best and that he could do her up. The defendant replied that he was too great a coward to fire that pistol. The firing began immediately. Witness had then just come out of the house, having been inside between twenty and thirty minutes. The witness denied that he went to the station house after the shooting and when called upon to identify deceased replied that he had never seen him before. Witness admitted that on the trial of Cook he testified that the deceased, at the time of the shooting, had on a light colored overcoat, and adhered to that statement.

Several witnesses, both for the State and the defense, failed to locate the witness Breeding at the house of the defendant at the time of the shooting, and those who testified that they saw him at the house during the night, stated that he came there an hour or an hour and a half before the shooting, remained some twenty minutes and left, and did not return until after the shooting.

A number of State's witnesses declared that when they

reached the Gibson house and found the deceased wounded, they observed particularly that he had on a black coat—the same coat which was introduced in evidence. One witness for the State testified that when Breeding came to the station house after the shooting, and looked at deceased, he asked him if he had ever seen the deceased before, and Breeding replied instantly and positively that he had not.

*Walton, Hill & Walton, M. G. Anderson* and *Jay Minter*, for the appellant: I. During the taking of testimony by the State, the inquiry was made of quite a number of State's witnesses as to the character of the house where the killing took place—the character of business carried on there, the avocation of the proprietress and of the women who lived there. Objection was made by the defendant to the inquiry, for the reason that the answer would be immaterial and irrelevant to the issue in the case, and, if the answer should be it was a house of prostitution and the inmates prostitutes, then such answer would be seriously prejudicial to her—would bias the minds of jurors against her; would draw off minds of jurors from the issue, guilt or no guilt; would distract the minds of jurors to a collateral question, and withdraw their attention from the very and only issue that legally could be considered by them, the facts and circumstances surrounding the killing under investigation; that it made no difference where the killing was done, whether in church, brothel, saloon or on the public street; the killing itself was the subject of inquiry, and not the place where it was done.

The objections were by the court overruled; the ruling being based on *obiter dicta* thrown out in Cook v. The State, 22 Texas Court of Appeals, 511, and all the witnesses answered that the house was one of prostitution and the inmates were prostitutes. To which ruling the defendant excepted and saved it by bill.

In the Cook case there was no such issue; the question there was whether the character of a house could be proved by reputation. In that case there was no objection to proving the character of the house, but to the character of the evidence adduced to make the proof; here the objection was directed to the fact itself—its legal competency to be heard and considered, no matter how proven.

A moment's consideration will convince the mind of the hurtful effect of the testimony admitted; *eo instanti* the minds of jurors were absolutely poisoned against defendant as the keeper

of a bagnio, and they could no longer look on her as a person presumed by the law to be innocent. She had been stabbed by a fact which could not throw light on the transaction for which she was on trial, and from thence she was hurled down the stream of prejudice to the end. There was no defense set up that deceased was killed because he had invaded private premises, or, being there, had transgressed decorum, or home or castle rights to the extent of forfeiting life. Nor was there any defense of that character; had there been, then it is possible, if not probable, that such evidence would have been admissible to rebut such a defense. Neither was the evidence admissible to be weighed by the jury on the issue as to whether the obnoxious words cast on defendant by deceased, she being the wife of the slayer, were insulting, etc.; for the reason that the court did not submit that issue to the jury. The truth is that the hurtful effect of that testimony was felt throughout the trial and particularly so in the result.

(See note under the head of "Relevancy," page 538, Clark's Crim. Law.)

II. The State, while taking testimony in chief, asked one or more of its witnesses these questions in brief:

1. What colored clothes did deceased have on when shot?—at the same time exhibiting and identifying some dark, bloody clothes with a bullet hole in them, as the clothes worn, etc.

2. Whether deceased had on, when shot, a white colored overcoat?

The witnesses, except Zeigler, answered, 1, identifying the exhibited clothes, and said they were dark; and, 2, that deceased did not have on a light colored overcoat.

After the State rested, defendant, among other witnesses, introduced D. H. Breeding, who, being examined by her, was turned over to the State for cross examination. Among other questions, the State asked in substance:

1. "Did you not swear on the trial of Cliff Cook that deceased had on a white colored overcoat?" To which he answered, "I did."

2. "Do you still so state?" "I do; I still think he had on a light colored overcoat."

3. "Are you as certain of that fact as you are of any other fact you have stated?" "I am; I then thought, and still think, deceased had on a light colored overcoat."

The State then brought in witnesses Bennett, Wilkins, Zeig-

ler, McClellan and Hill, and put to them severally the questions herein set out, to which questions defendant objected that they were not in impeachment nor in rebuttal; that defendant had drawn out nothing in regard to clothes; that the State having drawn out the statement of Breeding, and it being immaterial and collateral, must be content with the answer and could not contradict him or disprove his statement; that it was giving too great importance to the light colored overcoat fact, emphasizing to the jury that there was such a contradiction between the witnesses, etc., and drawing the minds of the jurors from the main and material facts in the case, etc. The court overruled the objections, and the witnesses, except Ziegler, answered as they had before, viz:

1. Deceased had on dark clothes, and identifying the bloody ones exhibited as the ones he had on; and

2. That he did not have on a light colored overcoat. Ziegler said deceased had on a dark gray coat.

(Code Crim. Proc., 509; Clark's Crim. Law, art. 1480.)

Of a like nature was the *rebuttal* fact elicited from witness Bennett about what Breeding said in regard to not knowing deceased at the station house.

It may be that the matter embraced in this bill is apparently of a trifling character, and to be governed under the discretion of the court, exercising such discretion soundly; but in this particular case we demur to such conclusions. It was not trifling in result, no matter how apparently trifling it may appear; it served to convict defendant, or at least played a large part in the so doing. It created, by the course of the evidence, the question of light overcoat, or not, into one of great proportions, and, through it, presented Breeding as being in contradiction on this grave question with the policemen, excepting Ziegler. The State did not by oversight forget the gray overcoat fact; no such statement was made; no such fact contended for. If this matter were controlled by the court's discretion, then the discretion should be soundly exercised. In this case, without any legal reason or excuse, the State was permitted to absolutely tear down and ruin the character of defendant's main witness on an issue made by the State itself, and in the making of which defendant had nothing whatever to do. An insignificant worm can eat out the heart, life and strength of the largest timbers, and, by gnawing with its soft lips at the roots, kill the sturdiest oak of the forest. So here, by this by-play, and we

can give it no more dignified name, the State, under the eye of the court, has procured the conviction of a citizen to infamous punishment. It was not right, just, or lawful, and if there were no other error or legal wrong in the trial, the case should go back and a fair trial be had. The witness Breeding was unimpeached and uncontradicted, save in this instance, and, though so curiously brought about, yet it had the effect to destroy him in the eyes of the jury.

III. When the State stated that it rested, defendant moved the court to require the State's attorney to place D. H. Breeding on the stand (who had sworn that he was an eye witness to the shooting, and had been shown to be on the ground by other witnesses, and the fact that he had so sworn was known to the court and state's attorney), and to examine him as to the facts by him seen as an eye witness, etc. This motion the State's attorney opposed, giving, however, no sufficient reasons therefor, and the court overruled it, and said witness was not put on the stand by the State and examined; to which ruling of the court defendant saved her bill, and here refers to it in the transcript on this subject matter. (Hunnicutt's case, 20 Texas Ct. App., 626, and authorities cited by Presiding Judge White; Phillips's case, 22 Texas Ct. App., 139.)

The authorities establish the rule that the State, in proper regard for truth and justice, should put on the stand every attainable eye witness of the transaction under investigation, unless they are very numerous, etc. In this case there were but two witnesses who with eye saw the occurrence, viz: the negro boy Nichols and the white man Breeding. The State contented itself by putting the negro youth on examination. We tried to have the State to examine Breeding. Our efforts were futile, and defendant was forced to produce him. It will not do to say that Breeding *was* on the stand and the defendant had the benefit of what he knew. That is not the question. It was the legal duty of the State, under the authorities, to put him on the stand to give defendant, presumed by the law to be innocent, the benefit of cross examination. It was the duty of the State to bring out the knowledge of all attainable eye witnesses to enable the jury to have the investigated matter before it from the different standpoints of observers. It was the duty of the State to bring *the facts* before the jury, and to establish from them defendant's guilt. She was presumed to be innocent until that presumption was overcome by inculpatory testimony, and

to do that the State was bound to present all testimony that could be obtained from all attainable eye witnesses.

The State, in making her case, drew from State's witnesses in original examination declarations of defendant as having been made before and after the shooting—the same being about, if not exactly, as follows:

1. Before the shooting—Nichols: Defendant cursed deceased; called him a bastard son of a bitch, d—d son of a bitch, etc. She went to Cook's room and told him to come out with his pistol. When Cook came out and was on the gallery, defendant said to him, "fire, fire," four or five times; that deceased said nothing at any time.

2. After the shooting—Bennett: Defendant said, "I shot him (deceased), he shot me, or tried to shoot me," or some such words. Hill: "I shot the d—d son of a bitch." Wilkins: "I shot him, he shot me." Ziegler: "I shot the bastard son of a bitch." McClellan: "I shot him; I shot in self defense."

All this in repetition of one conversation and at the same time and place.

Defendant, in making her defense, introduced George Cook, and by him proposed to prove the following facts, in substance, if not in exact words, explanatory of, in addition to, and in interpretation of what State's witnesses had said: That on the first of January, 1886, in defendant's parlor, he, witness, asked her, defendant, to state to him how the shooting of deceased occurred. That, among other things, she said that, prior to the shooting, she and deceased fell into a wordy altercation, in which harsh language was used by both parties; that among other things deceased said to her: "I have the best pistol, you d—d old whore, and can do you up;" that he then had his pistol in hand, making demonstrations with it. She replied to him: "You are a coward and have not the nerve to shoot that pistol—fire, fire;" that these words, "fire, fire," were used to deceased, and not to Cliff Cook, her husband; that about this instant the firing commenced; that she went to the room where Cook was, and told him what deceased had said to her, but did did not tell him to come out and bring his pistol; that, after the shooting was over, and before she learned that deceased was wounded, she took the pistol from Cook, knowing the police would soon be in the house, and she said to them that she did the shooting, that the man shot at her; that she was excited, and thought then, and still thought, that deceased shot at her, and that she was

wounded; that she took the pistol from Cook, not knowing that deceased was wounded, to shield him, Cook, from arrest for violating the city ordinance by shooting, etc.

To this evidence the State's attorney objected on the ground that it was not *res gestæ*, was self serving, and after defendant had time to think of or formulate a defense. The objections were sustained and the testimony rejected; to which ruling defendant excepted, etc. (Greene's case, 17 Texas Ct. App., 395; Harrison's case, 20 Texas Ct. App., 387.)

The court below and counsel for State tried to draw a distinction between above cited cases and the one under review, but on a comparison of the cases the legal or substantial difference does not exist and can not be drawn to be perceptible to the legal mind. Article 751, Code of Criminal Procedure, does away with the restrictions and limitations of the common law on its subject matter. So it has been ruled by this court, and the ruling is fully sustained by statutory construction.

It will be observed that the declarations of defendant after the shooting, as drawn out by the State, are not at all uniformly reported by the hearers of them. All the witnesses tried to report *the one* set of declarations, and, in doing so, vary as far as men could, in repetition of the same thing. It was a fit place for defendant's explanation to come in, if admissible in any case.

The words "fire, fire," and "come out with your pistol," constituted the pivotal points in the case. As to what was said and to whom were vital matters. That the words "fire, fire" were used is not denied; they were used but to deceased, and not to defendant's husband. That they were used to defendant's husband is sworn to by the negro boy Nichols, who, to say the least, gives out a "mass of confusion" as facts, and certainly the defendant had the right to explain what she did say—to be taken and weighed in connnection with the negro's testimony on that subject. She also had the right to explain what she did say to Cook when she went to his room, and at least to disaffirm the words falsely put in her mouth by the negro boy.

If Article 751, above mentioned, and the two cases cited speak the law, then there was manifest error committed in the exclusion by the court of the tendered facts, explanatory, etc., of words drawn out by the State for inculpatory purposes.

*W. L. Davidson,* Assistant Attorney General, for the State.

Hurt, Judge. At the last Galveston term of this court, the judgment in this case was affirmed without written opinion. By order of the presiding judge, a motion for rehearing was filed here, and has been ably argued by the counsel for the motion. The grounds of the motion will be considered in the order of their presentation.

Upon the examination of the witnesses for the State, it was elicited from a number of them that the homicide occurred in a bawdy house, and that appellant was its proprietress. Appellant objected to this testimony, and assigns as error the overruling of the objection.

We have not the slightest doubt of the admissibility of these facts. The acts and declarations of the participants could not be clearly understood in the absence of these facts. The presence of the deceased and others, the purchase of the beer, and the indecent language used, are presented in the clearest light when viewed with reference to the fact that they transpired at a bawdy house of which appellant was proprietress.

Over the objection of the appellant, the State proved by several witnesses that deceased, when shot, wore dark clothing, and that he did not have on a light colored or white overcoat. In passing upon the competency of this evidence, it is of the highest necessity to look to the offense in this case. The appellant introduced one Breeding, by whom she proved facts upon which she rested her defense, viz.: First, that Cliff Cook killed in self defense; and, second, manslaughter in Cook, because of insulting words to appellant, his wife.

On the other hand, the theory of the State evidently was that Breeding was not present at the homicide, and that the facts deposed to by him were sheer fabrications. In support of many other cogent circumstances tending to establish this theory, the State, before Breeding was introduced, as well as after his examination, with the proper predicate, overwhelmingly established that deceased, when shot, was dressed in dark clothes, and that he was not wearing a light colored or white overcoat. On the trial of Cliff Cook, as on this trial, Breeding swore in the most positive manner that the man he saw on the walk had on a light colored overcoat; that he was the man who had the pistol; that he was as positive that he (the man he saw on the walk) called Lilly Gibson a "whore," and that she told him to drop that gun, as he was that he had on a light colored overcoat.

The liberty, yes, even the life, of the appellant, rested upon,

was enchained in, the testimony of this man Breeding; for elim-
inating his testimony from the record, there is neither justifi-
cation, excuse nor mitigation for this homicide.    This being the
state of the case, the State had the right, and freely used it, to
anticipate the witness Breeding, and by its evidence in chief,
and that subsequent to the predicate in rebuttal, to completely
crush this witness, and by this method give the death blow to
each and every defense, excuse or matter in mitigation of the
homicide.    Breeding swore that the man on the sidewalk had
on a white or light colored overcoat; that of this he was positive.
The State says that Breeding was not present, and introduces
a number of facts to support this proposition, one of which is
that deceased did not have on such an overcoat.    If Breeding
testified falsely about the overcoat, or if, in fact, the man he
saw did have on a light coat, he may have also testified falsely
about being present, or it may have been another transaction.
This, however, under the facts, could not have been the case.

   Again, as above stated, the theory of the State was that Breed-
ing's testimony was fabricated; that in fact he was not present,
and did not see deceased until after he was moved to another
place, and as conclusive of this his positive oath to the color of
the overcoat is relied upon.    Does it tend to support the propo-
sition of the State?    Most evidently, and, under the peculiar
circumstances of this case, we think very cogently.

   When the State rested, the defendant moved the court to re-
quire the district attorney to place D. H. Breeding upon the
stand, because he had testified in the Cook case that he was an
eye witness to the shooting, and to examine him as to the facts.
This was resisted by the State and overruled by the court.
Neither the Hunnicut (20 Texas Ct. App., 626) nor the Phillips
(22 Texas Ct. App., 139) cases contain the doctrine that in all
cases and under all circumstances must the State place upon the
stand each and every witness to the transaction.    By reference
to those cases it will be found that the rule stated, by a fair con-
struction, would not require of the court the placing of all eye
witnesses to the transaction on the stand, under such circum-
stances as surround this case.    (*Vide* on this subject Ex parte
Smith, decided at the last Galveston term.)    We think there
was no error in overruling the motion.

   The State drew from State's witnesses the declarations of the
appellant, made immediately before and after the shooting, in
substance as follows:  Before the shooting defendant cursed de-

ceased; called him a "bastard son of a bitch," a "d—d son of a bitch," etc. She went to Cook's room and told him to "come out with his pistol." When Cook came out and was on the gallery, she said to him, "fire! fire!" four or five times. After the shooting: "I shot him! He shot me. I shot the d—d son of a bitch! I shot the bastard son of a bitch! I shot him in self defense." It will be borne in mind that these remarks were made immediately before and after the shooting, in fact were made *dum fervet opus*, as it were.

In making her defense, the appellant proposed to prove by George Cook substantially the following: That on January 1, 1886, in the defendant's parlor, witness asked defendant to state to him how the shooting occurred. That among other things she said that prior to the shooting she and deceased fell into a wordy altercation, in which harsh language was used by both parties; that among other things he said to her: "I have the best pistol, you d—d old whore, and can do you up!" That he had it in his hand then making demonstrations with it; and she replied to him: "You are a coward, and have not the nerve to shoot; fire! fire!" That the word "fire" was used to deceased and not to Cliff Cook; that about this instant the firing commenced, etc. To this evidence the State objected, and the objection was sustained.

Now, it is contended by counsel for appellant that, under the rule laid down in Green's case, 17 Texas Court of Appeals, 395, and followed in the Harrison case, 20 Texas Court of Appeals, 387, these declarations to George Cook were admissible; that those cases are strictly in point, and, for this court to sustain the ruling of the court below in this case, the Green and Harrison cases must be overruled. The Green case alone discusses this question, and we are very certain that there is no analogy between that and this case. But let us look to the statute. The latter part of Article 751 of the Code of Criminal Procedure is relied upon to support the admissibility of these declarations. That clause reads: "And when a detailed act, declaration, conversation or writing is given in evidence, any other act declaration or writing which is necessary to make it fully understood, or to explain the same, may also be given in evidence." It is not pretended by appellant that the proposed statements were *res gestæ*, but that they are admissible by virtue of the above statute. In the Green case there was no witness of the homicide. The State relied upon the voluntary confession of the ac-

cused made to a justice of the peace on the evening of the homicide. By reference to the confession introduced by the State, it will be seen that it is strictly a declaration detailing the particulars of the homicide, though not so full and complete as to be beyond a more perfect explanation, in order that it might be fully understood.

In the case in hand the State did not introduce in evidence a *detailed* declaration, a *detailed* conversation, or acts of the defendant. It confined the witnesses to the remarks and acts of the participants as they were made and occurred at the very time of the transaction, constituting strictly *res gestæ;* the transaction was simply introduced as it actually occurred,—as it spoke through the acts and words of the parties engaged. If the position of the appellant be correct, in all cases in which the State introduces in evidence a remark or act of the accused, though made and done at the very time the offense is committed, the accused would have the right to introduce any and all statements made by him at any subsequent time. To such a doctrine this court can not consent.

Breeding swore that the deceased called the appellant a "d—d old whore." Counsel for appellant requested the court to charge the jury the law of manslaughter arising from these insulting words to his wife; the court refused, and exception was taken. To this we reply that there is no evidence showing that Cook heard or was informed of the insult.

We have very carefully considered the matters urged for a rehearing, but have found nothing to induce us to alter our views of the case since its first examination. The motion for rehearing is overruled.

*Motion overruled.*