# N. W. THREADGILL V. THE STATE.

No. 15843.   Delivered May 10, 1933.
Rehearing Denied June 21, 1933.
Reported in 61 S. W. (2d) 821.

The opinion states the case.

*W. E. Fitzgerald,* of Wichita Falls, and *Rube Loftin* and *Clyde Suddath,* both of Henrietta, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, confinement in the penitentiary for six years.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed Robert McRay Wood by shooting him with a pistol.

The difficulty arose over a claim on the part of deceased that appellant owed him some money. Appellant testified that deceased had approached him some time prior to the homicide and told him, in effect, that he had to pay him what he owed him; that he told deceased that he had already paid his father the amount he was due deceased; and that deceased threatened to injure him.

On the day of the homicide appellant had driven to the home of deceased's brother, it appearing that the brother was a tenant of appellant. After loading a corn sheller into his wagon, appellant and his companion drove away. Deceased was some distance from the house near a mail box. According to appellant's testimony and that of his companion, deceased stopped them and demanded that appellant pay him what he owed him. He cursed appellant and started toward him, and appellant, according to his version, believing his life was in danger shot two or three shots in rapid succession.

The testimony of the state supported the theory that deceased was making no demonstration toward appellant at the time he was shot. Further, the state's testimony was to the effect that deceased was unarmed.

Bills of exception 6 and 7 relate to a controversy between appellant and one Roy Tims which took place some time prior to the homicide. As shown in bill of exception 6, while appellant was being cross-examined by state's counsel, he was asked if he had had a disagreement with Roy Tims two months prior to the homicide about some rent that he claimed Tims owed him.

Appellant objection to the question on the ground that it involved a separate and distinct transaction in which deceased was not concerned. Upon the objection being overruled, the state asked appellant several questions about the matter which elicited the fact that deceased was present when he (appellant) went to the home of Roy Tims in an effort to collect some rental due him. The bill shows that appellant testified that when he asked Tims about the rental, he (Tims) cursed him and told him he would kill him; that he tried to get in his car, for the purpose of leaving, but Tims' son and deceased prevented him from entering it. Being further questioned, appellant denied that he told deceased a few days later that he had "pulled a bonehead" in preventing him from entering his car. As shown in bill of exception No. 7, the witness Tims testified, over appellant's objection, that he had a disagreement with appellant on the occasion mentioned in bill of exception No. 6 relative to the payment of rent; that deceased was present at this time; that appellant invited him out of the house to settle the argument; that he followed appellant out of the house; that appellant went to his car and tried to get in; that deceased pushed the car door back and told appellant to stay out of the car, and that appellant told deceased there was not anything in the car; that later there was a law suit filed concerning the matter of rentals; that he had no discussion with appellant relative to deceased being a witness in this case. The court offered to instruct the jury not to consider the testimony relative to the institution of the suit, but appellant requested the court not to withdraw such testimony. The qualification to the bill of exception is to the effect that the court admitted the testimony relative to the transaction between appellant, Tims and deceased as bearing on the previous relations of appellant and deceased. The opinion is expressed that the bills of exception fail to reflect error. Deceased was involved in the altercation appellant had with Tims to the extent that he acted with Tims' son in preventing appellant from entering his automobile. That deceased's interference was calculated to cause appellant to feel unkindly toward him can not be denied. Appellant's attitude toward deceased was a matter to be determined by the jury. The testimony in question tended to make more probable the proposition that appellant acted upon malice aforethought when he fired the fatal shots. In Mr. Branch's Annotated Penal Code, sec. 97, it is said:

"Relevancy is defined to be that which conduces to the proof of a pertinent hypothesis—a pertinent hypothesis being

one which, if sustained, would logically influence the issue. Hence it is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less probable.

See McGuire v. State, 10 Texas App., 127; Lane v. State, 164 S. W., 378.

Bills of exception 8, 9 and 10 are concerned with the argument of counsel for the state. In the first of these bills it is shown that state's counsel, in argument to the jury, stated, in substance, that appellant coolly and calmly sat on the side of his wagon "with those steel beads the devil put in his head which he calls eyes, looking Ray Wood straight in the eye and Ray asking for money, he sat there cool and calm like the snake I think he is, hoping Ray Wood would lift an eyelash or hand or make one move so he could shoot the day lights out of him." Upon objection being made, the court instructed the jury to disregard the language "like the snake I think he is." In bill of exception No. 9 it is shown that state's counsel stated that appellant had written a verdict with the pistol he used and that he would spend the rest of his unnatural life in the penitentiary; and, further, that counsel wished appellant could live a thousand years to sit and brood over what he had done, and try to wash the blood of Ray Wood off of his claw-like hands. The court instructed the jury not to consider the statement "claw-like hands." The last bill shows that the district attorney used language as follows:

"He went into Eternity without a chance to make peace with his Creator. He was not surrounded by astute counsel or his father, like this defendant is here, with nine children, with the protection of law, but he stood there on that cold morning with his hands in his pockets and because of an assassin's bullet, three bullets, that went into his face first and his back two or more times, as fast as he could fire that gun, he is now lying in his grave."

Without approving the choice of language by counsel in his reference to appellant, we would not feel warranted in ordering a reversal because counsel referred to appellant's hands as "claw-like" and his eyes as "steel beads the devil placed in his head." In Jackson v. State, 42 S. W. (2d) 433, in which the punishment was assessed at death, stronger language was used by the district attorney than is reflected in the bills of exception under consideration. In that case we declined to order a reversal and cited many decisions by this court supporting our

conclusion. The last argument quoted does not appear to have been improper.

Bills of exception 11, 12 and 13 are also concerned with remarks made by counsel for the state in his argument to the jury. We deem it necessary to discuss only the first two of these bills. Bill No. 11 shows that the district attorney, in effect, said that appellant owned four or five farms. The court sustained appellant's objection to the argument. Appellant made no request that such argument be withdrawn from the jury. The second argument was, in substance, that appellant's belated action in supporting his application for a suspended sentence indicated that the case did not look good from appellant's standpoint. The court withdrew this argument in a written instruction, and advised the jury that the asking for a suspended sentence was not any evidence of guilt. We think the withdrawal of the remarks saved appellant from harm. It is the rule that unless the remarks are obviously of a nature to impair the rights of the accused or to improperly prejudice his case before the jury, such remarks, although improper, will not be considered cause for reversal when they are withdrawn and the jury instructed not to consider them. Branch's Annotated Penal Code, sec. 362; King v. State, 24 S. W., 514. As to the first argument, we have observed that no request was made to withdraw. The statement of facts shows that appellant was an owner of farms. Hence it would not appear that a statement to the effect that appellant owned four or five farms was so obviously prejudicial as to work a reversal of the judgment. In any event, under the circumstances, we would not feel warranted in ordering a reversal in the absence of a request at the time the argument was made that the court withdraw it from the consideration of the jury.

As shown in bill of exception No. 14, appellant sought to have the court instruct the jury, in substance, that abusive language might constitute "adequate cause." The court instructed the jury that if appellant was laboring under the immediate influence of sudden passion, such as anger, rage, resentment or terror, which rendered his mind incapable of cool reflection, and that such condition of mind was brought about by circumstances or conditions which would commonly have produced such state of mind in a person of ordinary temper, the penalty assessed could not be greater than five years confinement in the penitentiary. The court properly declined to instruct the jury as requested by appellant. The court gave the definition embraced

in Chapter 60, Acts 42 Leg., Reg. Session. See F. M. Birch-field v. State, Opinion No. 15842, delivered May 3, 1933.

We deem the criticism of the charge on self-defense to be without merit. Considering the charge in its entirety, it is thought that the issue of self-defense was adequately presented.

Other objections to the court's charge are not deemed to have been well taken.

In his motion for a new trial appellant set up newly dis-covered evidence, and attached the affidavit of the witness. The court's order overruling the motion for a new trial recites that evidence was heard. The evidence is not brought forward. It is the general rule that where the order of the court recites that the court heard evidence on the motion for a new trial, this court must presume that the court's action in overruling the motion was correct, and that the trial court acted upon evi-dence that was sufficient to justify his action. Rios v. State, 7 S. W. (2d) 535, and authorities cited. Applying the rule, we must presume that the court's action in overruling the motion was correct.

Failing to find reversible error, the judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

MORROW, PRESIDING JUDGE.—In the light of the motion for rehearing, both the law and the facts have been reviewed.

Robert McRay Wood, the deceased, was a young man about 20 years of age. His father was a tenant upon the farm of the appellant. On the morning shortly before the homicide, the appellant, in company with a negro, went in a wagon to the home of Lester Wood, a brother of the deceased, to get a corn sheller that had been loaned to Wood by the appellant. The deceased was on the premises. Shortly before the appellant left Lester Wood's home, the deceased, walked out of the premises and out to a place where there was a gate leading to the public road and to where there was a mail box. Appellant claims that while the team was passing through the gate, the deceased called "whoa" and the mules stopped; that the deceased then accosted the appellant in a threatening manner and demanded of him a sum of money which deceased claimed was owing him by the appellant for services rendered. From the appellant's testimony, it appears that on numerous previous occasions, the

deceased, in a peremptory and threatening manner, had demanded the payment mentioned. He had been told by the appellant that the money had been paid to the father of the deceased. According to the appellant, the deceased had, on several occasions and upon that on which deceased met his death, threatened appellant by his manner and by his words, and deeming his life in danger, appellant fired three shots at the deceased and killed him.

The negro who was with the appellant gave testimony corroborative of the appellant's description of the encounter in which the deceased was killed.

From his testimony, appellant advances the theory that the mules became frightened and that there was much excitement. The tragedy was seen by the witness Wright who testified for the state. The gate and mail box near which the deceased was killed were about 100 yards from the home of his brother, Lester Wood, who was also a tenant on one of the appellant's farms. Wright was driving an automobile, and as he approached the gate where the mail box stood, he saw a wagon with two men standing therein. As he approached further he saw a man standing by the mail box. When Wright was about 240 yards from the gate, he saw the man standing on the ground throw up his hands, turn, and fall. Upon reaching the man, he recognized him as Ray (McRay) Wood. The evidence of Wright and others were sufficient to demonstrate that deceased was unarmed. Deceased was reached by Wright and Lester Wood about the same time.

It was shown by the testimony of a doctor that the deceased was shot near the center of the chin. There were two other wounds in the back near the spinal column.

Lester Wood's testimony is in substance that while placing the corn sheller in the wagon the deceased walked away and went down a lane. After the departure of Ray Wood and the wagon, the wife of the witness called his attention to something that was happening. He looked through the window and saw his brother start towards the house. Just as the witness got to the window he heard a shot fired. He heard four shots fired, but heard none until after his attention was called to it by his wife. As he heard the fifth shot, he saw his brother attempt to get up, but after rising to his knees he fell over.

Mrs. Lester Wood, according to her testimony, was standing at the kitchen window and saw appellant shoot the deceased at the time he was standing near the mail box. When the first shot was fired, she heard Ray Wood scream and throw up his

hands to his face. Before hearing Ray scream, she saw appellant point at him. She then heard a shot fired. She knew there were four shots fired but was not positive about the fifth. Upon hearing the first shot she screamed and her husband ran to the window.

On direct examination the appellant related in great detail various conversations upon which he predicated the claim that the deceased had hostile designs upon the life of the appellant. On cross-examination of the appellant the state was permitted to relate an occurrence in which the appellant, the deceased, and Roy Tims were actors. The appellant's testimony upon the subject is in substance as follows: He visited Tims for a settlement of the rental. A quarrel resulted during the course of the settlement. Tims raised a row, used abusive language, and threatened the appellant. Tims said to the deceased who was present: "Let's not let him get in his car." The deceased did nothing. Tims was called by the state and gave his version of the incident. Appellant admitted that in discussing the incident with Tims he had said to the brother of the deceased: "Old man Tims pulled a bone-head cursing me over there at the house." Appellant claimed that nothing was said by the deceased.

The importance of the incident with Tims apparently is overstressed in the brief of the appellant. We perceive nothing in it that seriously reflected upon the appellant. However, it was a transaction in which the deceased was present and apparently was a guest and friend of Tims. In addition to the precedents referred to in the original opinion, attention is directed to article 1257a, P. C., in which the following occurs: "In all prosecutions for felonious homicide the State or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the homicide, which may be considered by the jury in determining the punishment to be assessed."

In the case of Vineyard v. State, 96 Texas Crim. Rep., 401, the following statement is found: "We think the only safe rule to be that this court should not hold an argument to be reversible error unless it is in extreme cases where the language complained of is manifestly improper, harmful, and prejudicial, or where a mandatory provision of the statute is violated, or some new and harmful fact injected into the case. Stanchel v. State,

89 Texas Crim. Rep., 358, 231 S. W., 120; Henderson v. State, 76 Texas Crim. Rep., 66, 172 S. W., 793; Bowlin v. State, 93 Texas Crim. Rep., 452."

Many cases are cited in the. case mentioned and many others will be found in the books expressing thé views of this court and others that in appraising the complaint of the argument of counsel, there must be considered not only the argument (unless it offends against some statutory provision), but the setting in which it appears, the evidence in the case, and the verdict of the jury. See Borrer v. State, 83 Texas Crim. Rep., 198; and cases cited; also Branch's Ann. Tex. P. C., p. 205. See, also, Silver v. State, 110 Texas Crim. Rep., 512; Fritts v. State, 42 S. W. (2d) 609; Russell v. State, 44 S. W. (2d) 727; Howard v. State, 53 Texas Crim. Rep., 378.

We are unable to accede to the view of the appellant's counsel touching the action of the parties at the immediate time of the homicide. We regard the evidence, particularly that of the witnesses Wright, Lester Wood and Mrs. Lester Wood, as justifying the jury in rejecting the appellant's theory of self-defense.

Regarding the disposition of the case made upon the original hearing as proper, the motion for rehearing is overruled.

*Overruled.*