FRANK JONES v. THE STATE.

No. 16220. Delivered October 18, 1933.
Rehearing Denied January 24, 1934.
Reported in 67 S. W. (2d) 279.

The opinion states the case.

*McGaugh & Darroch,* of Brownwood, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MORROW, PRESIDING JUDGE.—The offense is murder; penalty assessed at confinement in the penitentiary for fifty years.

That Ocie Pierce was killed by the appellant on the 17th day of January, 1933, was proved by the state's testimony, as well as that of the appellant, who testified in his own behalf. It is claimed by the appellant that he acted in self-defense in firing the shots which took the life of the deceased. Much testimony was before the jury in behalf of the appellant to the effect that deceased possessed a violent temper and cruel disposition; that his reputation was that of one calculated to execute a threat if made, and that the deceased had threatened to take the life of the appellant upon several occasions. There was proof of many circumstances tending to support the claim of the appellant touching the disposition of the deceased.

The following is a synopsis of the testimony of the appellant given in his behalf: O. L. Pierce was a farmer. He and his wife lived upon a farm. Appellant was a tenant or employee of Pierce and had lived with the Pierce family for some two years, doing work upon the farm. During that time there had been ill feelings and quarrels in which Pierce was the prime actor, but prior to the homicide mutual reconciliations had taken place. Several times prior to the homicide Pierce, in the presence of the appellant, had used extremely rough language to Mrs. Pierce and ordered her to put on overalls and go and repair a fence. Appellant told Pierce that he would repair the fence, whereupon Pierce became violently angry, exhibited a pistol and threatened to kill the appellant. He only desisted from doing so after a scuffle in which the appellant pleaded

that his life be spared. On the following morning, while Pierce was milking, appellant went to the kitchen and entered into a conversation with Mrs. Pierce. She was told by the appellant that due to the incident on the previous day, he intended to leave. Mrs. Pierce protested and said that if appellant had not been there she would have been killed by her husband; that if appellant would remain she would leave at the first opportunity and go to her folks. In that connection Mrs. Pierce mentioned the threat that her husband had made in regard to both appellant and herself. Pierce claimed that between his wife and the appellant there was some improper intimacy or relationship, and stated that if he found anything of that nature he would kill both of them. Appellant claimed in his testimony that such insinuation was without foundation. Soon after the incident in which Pierce drew his pistol and threatened and attempted to kill the appellant, he apologized and urged that appellant remain upon the premises, stating that he was preferred to any other person. Appellant was present when one Rickel had been abused and threatened by Pierce upon the claim that Rickel had been guilty of some conduct towards the wife of Pierce which he interpreted as insinuating or improper. On the day upon which Pierce was killed, appellant left home about noon and returned about two o'clock in the afternoon. While he was absent, appellant went to several places to obtain cartridges and did obtain a number of cartridges suitable for use in a pistol which he possessed. In his testimony appellant explained the purchase of the cartridges with the statement that some days before he and Pierce had fired their pistols "for fun" in order to frighten some one and that in doing so appellant had exhausted his supply of cartridges; that he desired to replace them as he was in the habit of keeping a pistol and cartridges. According to his testimony, when appellant returned to the Pierce home on the day of the homicide, the deceased and his wife were sitting together in the "fire-place room." Appellant entered and some conversation took place about his returning to Mineral Wells for treatment. The parties were all sitting down and Pierce was sitting near the "portable" and might have been playing it. He and his wife were on opposite sides of the fire-place. Mrs. Pierce was either sewing or patchng. From the testimony we quote:

"I made some remark to her husband at that time about his course of conduct toward his wife. Well, she was sitting there crying, almost crying, she had been. Well, I asked him why did he treat Alma like he did, or what made him treat Alma like he did. Whenever I asked about that, he just jumped

to his feet like that and reached for his gun. He said something but I don't know exactly what he said. Well, I shot at him. I hit him at that time. He jumped behind his wife. He began to pull her across the room here to the south porch and after I got out there I told him to get out from behind her if he wanted to talk to me, and he stepped out from behind her and started for me, and I stepped out and said, 'Ose, don't come to me again,' and he started again and started again, and I said, 'Ose, don't come, stand back,' and he started again and I shot him twice, and turned and went back in the fire-place room and sat down. Well, I thought he had a gun on at that time. In my own mind I knew it. Yes, he was in the habit of having a gun all the time. I was in fear of my life at the time, yes. If I hadn't been in fear of my life I don't guess I would have shot him. I was in fear of my life."

The appellant testified further: "Well, I knew that there was one of the bullets went through his arm, because when he was behind his wife walking with her out on the porch there was blood running off his arm on the floor. * * * He was out on the porch on the south side of the house. When the last two shots were fired he fell with his head off of the porch. * * * The last time I seen him he was falling and I turned and walked back in the house. * * * Well, when I fired those last two shots, I did feel that my life was in danger, all right, because I didn't know whether he was dead."

On cross-examination, appellant testified, in substance that he and the Pierce family had known each other for a long time; that he and Pierce had had trouble about some car parts and some boots; that Pierce knew that his wife had bought the appellant a suit of silk underwear for Christmas. Appellant first knew that Pierce was jealous of his wife when she gave him the gift at Christmas. There were times when Pierce had gone away from home and remained over night; that there was no one at home but appellant and Mrs. Pierce. Appellant had heard Mrs. Pierce and her husband talk about him the night before the killing. Appellant testified: "Well, I don't know exactly what all they did say. Anyhow, he was mad. Yes, I remember it. Well, he said that he was going in there in my room and kill me."

Appellant said that he had not told this to his counsel or any one before. In going for the cartridges, appellant testified that he went to more than one place; that he drove a distance of about eleven miles; that he used the car belonging to Pierce and paid for the gasoline with a check for one dollar to which he signed Pierce's name; that he had been given authority to

sign Pierce's name by the latter's wife; that he did not think any other person knew that he had the privilege of signing Pierce's name to the check. Upon reaching home, appellant went into the room where Pierce and his wife were sitting. He saw that she had been crying.

Appellant denied that Pierce fell in the fire-place room and testified that the killing took place on the porch. Pierce was wounded before he reached the porch. After the shooting, Mrs. Pierce acted friendly toward the appellant and requested that he straighten up the body of the deceased as part of his head was over the porch. Appellant complied with her request.

Appellant claimed to have shot Pierce in the wrist; that he snapped his pistol twice. It failed to fire, so he took the cartridges out and replaced them with others. He threw the cartridges on the floor. Appellant said that after the first shot was fired Pierce got behind his wife; that Pierce wanted to talk to appellant and was told to get out from behind his wife. At that time Pierce had no pistol and was not reaching for his gun. His hand was bleeding and was in sight of the appellant.

Mrs. Pierce, called by the state, testified that when appellant returned home he came into the room and asked for her husband. He was told that Pierce was not around. Appellant left the room for a few minutes during which time Pierce came in. She confirmed the statement that Pierce had commanded her to repair the fence. She said that she feared him; that he had struck her with a switch; that he had shot livestock when he was angry. She testified that she had washed up some blood on the floor of the room in which the deceased was sitting when the shooting began.

According to the testimony of Doctor Cleveland, who examined the body of the deceased, there were five bullet holes on the body. Two wounds were in the wrist, one just above the stomach, one in the back and one in the left shoulder. There was one wound through the wrist on the left arm.

In Bill of Exception No. 1, it is shown that the witness Walker, on behalf of the appellant, had testified that he had knowledge of the character and reputation of the deceased and that it was that of a violent and dangerous man who was calculated to carry out a threat if made. On cross-examination, Walker was asked the following question: "Q. You never heard of him (deceased) paying a fine in your life?"

The witness, over objection of the defendant, answered: "Well, no, I don't think I ever heard of them speaking of it."

The court approved the bill with the following qualification: "The Court has excluded from the consideration of the jury this

evidence in the following language: 'The court: As to whether or not he has ever been charged with an offense, I will exclude that from the consideration of the jury. Don't consider that for any purpose whatever. I don't think that is admissible."

This court is clearly of the opinion that as qualified the bill shows no error.

Bill of Exception No. 2 reveals that the witness Walker, after having testified that the deceased had the reputation of a violent and dangerous man and was calculated to carry out a threat, was asked the following question: "Q. You never heard of him being charged with any violation of the criminal law?"

The witness answered: "He never told me and I had never heard of any. Never heard of any, no sir."

The court qualified the bill with the following statement: "It appears from the court reporter's record that the defendant's objection was sustained and the evidence withdrawn from the jury."

From Bill of Exception No. 3 it is shown that the appellant introduced evidence by several witnesses to the effect that the deceased was of a dangerous and cruel disposition; that a short time before the homicide he had threatened to take the life of the appellant, of which threat the appellant was aware; that shortly before the homicide the deceased had shot at one McCaslin, a neighbor, while the latter was driving some hogs out of his field; and that on the night before the homicide the deceased had declared in the presence of the appellant, the wife of the deceased and Will Rickel that he had intentionally shot at McCaslin on the occasion in question. The witness Homer McCaslin testified that while he was in his father's field, the deceased was in the adjoining field which belonged to him. McCaslin was chasing some hogs out of the field. While about 150 yards from McCaslin the deceased shot twice. McCaslin said it felt like the bullets were coming close to him; that he did not know; that the first one sounded like it was closer than the last shot; that he did not see the bullets hit the ground; that they went through the air. McCaslin saw the deceased have a Winchester of some kind in his hand. On cross-examination by state's counsel, McCaslin testified that the deceased told him in a subsequent conversation that he was shooting at a rabbit. "Well, he didn't say he wasn't shooting at me; said he was shooting at a rabbit." Appellant complains of the introduction of this testimony, citing Branch's Cr. Law, secs. 477-478, pp. 306-307, and various cases.

In the same bill (No. 3), it is shown that the witness Rickel testified that a short time before his death the deceased, in the

presence of the appellant and the witness, stated that he shot at McCaslin at the time and place referred to above.

Apparently the testimony of McCaslin, against which objection is urged, is within the purview of article 728, C. C. P., 1925, wherein it is said: "When a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration or writing which is necessary to make it fully understood or to explain the same may also be given in evidence."

Whether within the scope of the statute mentioned, the opinion is entertained that no error justifying a reversal is disclosed by the bill.

It is a principle of law that in a case of homicide the accused claiming self-defense is not to be affected by the undisclosed motives of the deceased. See Branch's Cr. Law, sec. 477. However, the rule does not exclude acts or declarations of the deceased known to the appellant; nor does it exclude certain circumstances tending to show that the deceased was not the aggressor, such as that he did not possess a weapon at the time of the homicide or that if possessed, the weapon was not in a condition for use. The evidence that the deceased was unarmed at the time he was killed is not controverted. Under such circumstances it is thought that the evidence of which complaint is made could not justly be made a ground for a reversal. See Godwin v. State, 39 Texas Crim. Rep., 404.

In Bill No. 4 it appears that while counsel for the state was cross-examining the appellant in regard to the pistol with which he shot the deceased, which examination was in the presence of the jury, the following language was used: "Q. You know you have carried it (the pistol) a million times?"

In qualifying the bill the court stated: "Upon objections being made to the statement of counsel shown in this bill of exception counsel immediately withdrew the question or statement and the court instructed the jury not to consider it."

It is thought that the bill shows no prejudicial error. We take note of the fact that in his own testimony the appellant admitted that he had carried the pistol in question.

In Bill No. 5 there is complaint that the district attorney, in the course of his argument to the jury, used the following language: "The one who has not shed a tear for her deceased husband (referring to the wife of the deceased) who has not assisted us (the attorneys for the state) in any way in this case, gave a pair of silk underwear to the defendant on Christmas."

The bill also contains the following:

"Be it further remembered, that no evidence had been in-

troduced upon the trial of this cause that the wife of the deceased had not shed a tear for her deceased husband, nor that she had not given any assistance to the prosecution of this case against the defendant; and, the defendant, through his counsel, at the time said statement was made called the same to the attention of the Court, and counsel for the state, and verbally requested and moved the Court to instruct the jury not to consider the same for any purpose, for the reason and upon the ground that the same was out of the record, and was not supported by any testimony in the cause, and was an attempt to impeach the wife of the deceased who was a witness in behalf of the state, and to show collusion between the said witness and the defendant by said statement and evidence of the District Attorney, and was highly inflammatory and prejudicial to the rights of the defendant."

"The above and foregoing bill of exception, having been examined by me, is hereby approved and ordered filed as a part of the record in this cause with the following qualification or explanation:

"It is here certified that the Honorable Joe H. Eidson, before whom said cause was tried, is dead, and that I have been appointed as his successor, and have duly qualified by taking the oath required by law.

"I find in the record no written request was made to the presiding judge at the time of the trial requesting that the argument complained of be withdrawn from the jury, and I have nothing before me except the statement of counsel for the defendant that the objections urged to this argument, as set out in this bill, were made. The stenographer's notes merely show that the defendant through his attorney stated that he objected to this argument. The state did place the wife of the deceased on the stand, but did not ask her questions relating to the immediate act of the killing. The jury saw the witness, her demeanor on the stand, saw her manner and heard her testimony. The District Attorney was evidently anticipating that the state would be criticised for not fully examining the witness on this point and later in the argument the defense counsel did criticise the state for not fully and particularly interrogating this witness, and drew conclusions from such failure unfavorable to the state and favorable to the defendant."

The testimony found in the record relating to the actions and conversations of the appellant and the wife of the deceased before, at the time of and after the deceased was slain, was not such as to preclude criticism of their conduct.

Our examination of the evidence, the argument, and the

authorities leaves us of the opinion that no reversible error is shown. We take note of the fact that there were certain exceptions to the court's charge. It is to be observed, however, that those which were deemed pertinent and material were embraced in special charges which were given to the jury. Among them was one instructing the jury on the right of the appellant to arm himself; and another defining adequate cause in a manner favorable to the appellant and giving full effect to the statute, chaper 60, Acts 42nd Legislature, Reg. Session, p. 94.

On the record before us, we are constrained to order an affirmance of the judgment, which is accordingly done.

*Affirmed.*

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—Appellant urges that we were in error in disposing of the matter complained of in Bill of Exception No. 3. We do not re-state the question involved, but for an understanding of it, refer to our original opinion. It is claimed that the case of Godwin v. State, 39 Texas Crim. Rep., 404, does not support the conclusion announced, but that the evidence there complained of is shown to have been admissible as a declaration of the defendant made under circumstances which rendered it available to the state. We are inclined to agree with the appellant in such position. However, we think the appellant is mistaken in his contention that the holding in Gibson v. State, 23 Texas App., 414, 5 S. W., 314; and Lawler v. State, 110 Texas Crim. Rep., 460, 9 S. W. (2d) 259, rules the present case on the point under consideration. Those cases were dealing with an effort to impair or qualify a strictly res gestae statement by a subsequent declaration. The conduct of deceased towards or regarding McCaslin was not res gestae of the offense for which appellant was on trial. As to him it was a collateral matter invoked as showing a specific act of violence on the part of the deceased of which appellant had knowledge at the time he claimed to have killed deceased in self-defense. Appellant sought to show the violent and dangerous character of deceased by proving that his general reputation in that regard was bad. He further claimed to have been informed by deceased himself of the specific act of violence towards McCaslin. Appellant might have rested the matter on the information which he had received (Messimer v. State, 87 Texas Crim. Rep., 403, 222 S. W., 583), but he went further, as he had a right to do under the authorities, and called McCaslin to prove the occurrence of the specific act of violence in question. In doing so appellant took the chance of the state,

on cross-examination of the witness, developing facts regarding the act which would minimize or discount its effect as an act of violence although such cross-examination might develop facts regarding the act of which appellant had no knowledge. Hysaw v. State, 69 Texas Crim. Rep., 652, 155 S. W., 941; Bullock v. State, 73 Texas Crim. Rep., 419, 165 S. W., 196; Johnson v. State, 74 Texas Crim. Rep., 179, 167 S. W., 733; Messimer v. State, supra; Castleberry v. State, 84 Texas Crim. Rep., 271, 206 S. W., 353. We think appellant's objection to the testimony of McCaslin that some days after the act of deceased in firing his rifle, the latter told the witness that on said occasion deceased was shooting at a rabbit could not be sustained on the ground that it occurred out of the presence of appellant and that he had no knowledge of such statement having been made by deceased. The act of deceased, as between him and McCaslin, was collateral as to appellant, but had been gone into by him, and the statement of deceased related to a transaction between him and McCaslin regarding which appellant had opened inquiry. If the statement of deceased to McCaslin explained the act which appellant had introduced in evidence, it was admissible although made at a time subsequent to the act under the provisions of article 728, C. C. P., which is quoted in our original opinion. See Greene v. State, 17 Texas App., 395; Bonnard v. State, 25 Texas App., 173, 7 S. W., 862, 8 Amer. St. Rep., 431; Lawler v. State, 110 Texas Crim. Rep., 460, 9 S. W. (2d) 259; and the cases cited in paragraph 15 of said opinion.

We undertook in the case last cited to point out the distinction between the holding in the Gibson case and that in the Greene and Bonnard cases, supra. We believe such distinction should be kept in mind in disposing of the question presented in Bill of Exception No. 3.

The argument complained of is set out in our original opinion. The general rule is that in appraising the complaint of argument of counsel there must be considered not only the language used but the setting in which it appears, the evidence in the case, and the verdict of the jury. See Threadgill v. State, 61 S. W. (2d) 821, and cases therein referred to. Regarding the argument in the light of the entire record, our views remain unchanged that a reversal should not be predicated thereon.

The motion for rehearing is overruled.

*Overruled.*